**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

Case No.: _____

GOVERNMENT EMPLOYEES INSURANCE CO.,
GEICO INDEMNITY CO., GEICO GENERAL
INSURANCE COMPANY, and GEICO CASUALTY CO.,

                Plaintiffs,

      -v-                                       **Jury Trial Demand**

ANNIE LYN CASTA, M.D., SOS MEDICAL CENTER
CORP. d/b/a CIMA MEDICAL CENTER CORP.,
ANIL T. ABRAHAM, M.D., CIMA MED CENTER MIAMI
SPRINGS, LLC, CARLOS ALBERTO HURTADO
INFANTE, M.D., JOHNNIE CISNEROS, CASTELLON
MEDICAL CENTER, LLC, FRANCISCO PEREZ, L.M.T.,
COMMUNITY CHOICE HEALTH NETWORK, CORP.,
and RICHARD GARCIA PRADA,

                Defendants.

_____/

## **COMPLAINT**

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General

Insurance Company, and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), as and for

their Complaint against Defendants Annie Lyn Casta, M.D. ("Casta"), SOS Medical Center Corp.

d/b/a CIMA Medical Center Corp. ("CIMA"), Anil T. Abraham, M.D. ("Abraham"), CIMA Med

Center Miami Springs, LLC ("CIMA Miami Springs"), Carlos Alberto Hurtado Infante, M.D.

("Infante"), Johnnie Cisneros ("Cisneros"), Castellon Medical Center, LLC ("Castellon"),

Francisco Perez, L.M.T. ("Perez"), Community Choice Health Network, Corp. ("Community

Choice"), and Richard Garcia Prada ("Garcia Prada")(collectively the "Defendants"), hereby

allege as follows:

1.     This action seeks to recover more than $2,900,000.00 that the respective Defendants wrongfully obtained from GEICO by submitting – or causing to be submitted – thousands of fraudulent and unlawful no-fault ("no-fault", "personal injury protection", or "PIP") insurance charges through Defendants CIMA, CIMA Miami Springs, Castellon, and Community Choice (collectively the "Clinic Defendants") relating to medically unnecessary, illusory, unlawful, and otherwise non-reimbursable health care services and goods, including putative initial examinations, physical therapy and chiropractic, pain management injections, home medical equipment ("HME"), and related services and goods (collectively the "Fraudulent Services") that purportedly were provided to Florida automobile accident victims who were eligible for coverage under GEICO PIP insurance policies ("insureds").

2.     Additionally, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $75,000.00 in pending fraudulent and unlawful PIP claims that the respective Defendants submitted through the Clinic Defendants, because of the fraudulent and unlawful activities described herein.

3.     As set forth herein, the Defendants were never entitled to receive payment on the PIP insurance claims that they submitted to GEICO, because:

(i)     at all relevant times, the Defendants operated in pervasive violation of Florida law, including: (a) the licensing and operating requirements set forth in Florida's Health Care Clinic Act, Fla. Stat. §§ 400.990 et seq. (the "Clinic Act"); (b) Florida's False and Fraudulent Insurance Claims Statute, Fla. Stat. § 817.234(7) (the "False and Fraudulent Insurance Claims Statute"); and (c) Florida's Physical Therapy Practice Act, Fla. Stat. §§ 486.011-486.172 (the "Physical Therapy Act"), thereby rendering the Defendants ineligible to collect PIP insurance benefits in the first instance, and rendering the Defendants' PIP insurance charges noncompensable and unenforceable;

(ii)    the underlying Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide genuine patient care to the insureds who purportedly received and were

subjected to the Fraudulent Services;

(iii)    in many cases, the Fraudulent Services were never legitimately provided in the first instance;

(iv)    the Defendants' billing for the Fraudulent Services misrepresented and exaggerated the nature, extent, and results of the Fraudulent Services, in order to fraudulently and unlawfully inflate the charges submitted to GEICO;

(v)    the Defendants unlawfully billed GEICO for "physical therapy" services that were provided by massage therapists and unlicensed/unsupervised individuals; and

(vi)    the Defendants' billing for the Fraudulent Services misrepresented the identities of the individuals who performed or directly supervised the Fraudulent Services, and the billing was submitted in violation of the requirements set forth in Florida's Motor Vehicle No-Fault Law, Fla. Stat. §§ 627.730-627.7405 (the "No-Fault Law").

4.    As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed to GEICO through the Clinic Defendants.

5.    Each charge submitted by the Defendants through the respective Clinic Defendants since at least 2019 has been fraudulent and unlawful for the reasons set forth herein. The charts annexed hereto as Exhibits "1" - "4" set forth large and representative examples of the fraudulent and unlawful claims that have been identified to-date that the Defendants submitted to GEICO by mail through the respective Clinic Defendants.

6.    The Defendants' interrelated fraudulent and unlawful schemes began no later than 2019 and have continued uninterrupted since that time. As a result of the Defendants' schemes, GEICO has incurred damages of more than $2,900,000.00.

## PARTIES

### I.   Plaintiffs

7.    Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs") are

Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and issue automobile insurance policies in Florida.

## II.   **Defendants**

8.     Defendant Casta resides in and is a citizen of Florida. Casta was licensed to practice medicine in Florida on or about September 18, 2013. Casta falsely purported to perform or directly supervise many of the Fraudulent Services at CIMA, CIMA Miami Springs, Castellon, and Community Choice; falsely purported to serve as medical director at CIMA Miami Springs, Castellon, and Community Choice; and used CIMA, CIMA Miami Springs, Castellon, and Community Choice as vehicles to submit fraudulent, unlawful, and non-reimbursable PIP billing to GEICO and other insurers.

9.     Defendant CIMA is a Florida corporation with its principal place of business in Miami, Florida, and was owned and controlled by Infante and Cisneros. CIMA was incorporated in May 2018, falsely purported to be a properly licensed health care clinic that operated in compliance with the licensing and operating requirements set forth in the Clinic Act, and was used as a vehicle to submit fraudulent, unlawful, and non-reimbursable PIP billing to GEICO and other insurers.

10.     Defendant Abraham resides in and is a citizen of Florida. Abraham was licensed to practice medicine in Florida on or about June 25, 2009. Abraham falsely purported to serve as medical director at CIMA, and used CIMA as a vehicle to submit fraudulent, unlawful, and non-reimbursable PIP billing to GEICO and other insurers.

11.     Defendant CIMA Miami Springs is a Florida limited liability company with its principal place of business in Miami Springs, Florida, and was owned and controlled by Infante and Cisneros and had them as its members. CIMA Miami Springs was organized in May 2020,

4

falsely purported to be a properly licensed health care clinic that operated in compliance with the licensing and operating requirements set forth in the Clinic Act, and was used as a vehicle to submit fraudulent, unlawful, and non-reimbursable PIP billing to GEICO and other insurers.

12.     Defendant Infante resides in and is a citizen of Florida. Infante was licensed to practice medicine in Florida on or about January 8, 2013. Infante owned and controlled CIMA and CIMA Miami Springs (along with Cisneros), and used CIMA and CIMA Miami Springs as vehicles to submit fraudulent, unlawful, and non-reimbursable PIP billing to GEICO and other insurers.

13.     Defendant Cisneros resides in and is a citizen of Florida. Cisneros is not licensed to practice any health care profession in Florida. Cisneros owned and controlled CIMA and CIMA Miami Springs (along with Infante), and used CIMA and CIMA Miami Springs as vehicles to submit fraudulent, unlawful, and non-reimbursable PIP billing to GEICO and other insurers.

14.     Defendant Castellon is a Florida limited liability company with its principal place of business in Miami, Florida, and was owned and controlled by Perez and had him as its member. Castellon was organized in December 2015, falsely purported to be a properly licensed health care clinic that operated in compliance with the licensing and operating requirements set forth in the Clinic Act, and was used as a vehicle to submit fraudulent, unlawful, and non-reimbursable PIP billing to GEICO and other insurers.

15.     Defendant Perez resides in and is a citizen of Florida. Perez was licensed to practice massage therapy in Florida on or about November 1, 2011. Perez owned and controlled Castellon, and used Castellon as a vehicle to submit fraudulent, unlawful, and non-reimbursable PIP billing to GEICO and other insurers.

16.     Defendant Community Choice is a Florida corporation with its principal place of

business in Hialeah, Florida, and was owned and controlled by Garcia Prada. Community Choice was incorporated in August 2020, falsely purported to be a properly licensed health care clinic that operated in compliance with the licensing and operating requirements set forth in the Clinic Act, and was used as a vehicle to submit fraudulent, unlawful, and non-reimbursable PIP billing to GEICO and other insurers.

17.     Defendant Garcia Prada resides in and is a citizen of Florida. Garcia Prada is not licensed to practice any health care profession in Florida. Garcia Prada owned and controlled Community Choice, and used Community Choice as a vehicle to submit fraudulent, unlawful, and non-reimbursable PIP billing to GEICO and other insurers.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and the action is between citizens of different states.

19.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations (RICO) Act).

20.     Additionally, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

21.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Southern District of Florida is the District where one or more of the Defendants reside, and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS

### I.    Overview of the Pertinent Laws Governing No-Fault Insurance Reimbursement

22.    Florida has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries. The statutory system is set forth in the No-Fault Law, which requires automobile insurers to provide personal injury protection benefits ("PIP Benefits") to insureds.

23.    Under the No-Fault Law, an insured can assign their right to PIP Benefits to health care services providers in exchange for their services. Pursuant to a duly executed assignment, a health care services provider may submit claims directly to an insurance company using the required claim forms – including the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form") – in order to receive payment for medically necessary services.

24.    Pursuant to the No-Fault Law, insurers such as GEICO are only required to pay PIP Benefits for "medically necessary" services. At the same time, a health care services provider, including a clinic licensed under the Clinic Act, is only eligible to receive PIP Benefits for medically necessary services.

25.    Pursuant to the No-Fault Law, "medically necessary" means:

[A] medical service or supply that a prudent physician would provide for the purpose of preventing, diagnosing, or treating an illness, injury, disease, or symptom in a manner that is:

      (a)    In accordance with generally accepted standards of medical practice;

      (b)    Clinically appropriate in terms of type, frequency, extent, site, and duration; and

      (c)    Not primarily for the convenience of the patient, physician, or other health care provider.

26.    PIP reimbursement for health care services is normally limited to $2,500.00 per

insured. However, if a physician, physician assistant, or advanced practice registered nurse determines that an injured person suffered from an "emergency medical condition", health care providers can be reimbursed up to $10,000.00 per insured for health care services. See Fla. Stat. § 627.736.

27.     Pursuant to the No-Fault Law, an "emergency medical condition" means "a medical condition manifesting itself by acute symptoms of sufficient severity, which may include severe pain, such that the absence of immediate medical attention could reasonably be expected to result in any of the following: (a) [s]erious jeopardy to patient health[;] (b) [s]erious impairment to bodily functions[; and/or] (c) [s]erious dysfunction of any bodily organ or part."

28.     In order for a health care service to be eligible for PIP reimbursement, it not only must be medically necessary, but also must be "lawfully" provided.

29.     Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment."

30.     Thus, health care services providers, including clinics licensed under the Clinic Act, may not recover PIP Benefits for health care services that were not provided in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of Florida and federal law related to the provision of the underlying services or treatment.

31.     By extension, insurers such as GEICO are not required to make any payments of PIP Benefits for health care services that were not provided in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of Florida and federal law related to the provision of the underlying services or treatment.

32.     Pursuant to the Clinic Act, and subject to certain limited exceptions that are not

applicable in this case, a license issued by the Florida Agency for Health Care Administration (the "AHCA") is required in order to operate a clinic in Florida. The Clinic Act defines "clinic" to mean "an entity where health care services are provided to individuals and which tenders charges for reimbursement for such services, including a mobile clinic and a portable equipment provider."

33.     Pursuant to the Clinic Act, health care practices operating in Florida without a valid exemption from the health care clinic licensing requirements must – among other things – appoint a physician as medical director who must "[c]onduct systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful," and take immediate corrective action upon discovery of a fraudulent or unlawful charge. Additionally, a clinic medical director must "[e]nsure that all health care practitioners at the clinic have active appropriate certification or licensure for the level of care being provided."

34.     Pursuant to the Clinic Act, no health care clinic in Florida may operate without the day-to-day supervision of a legitimate physician-medical director.

35.     Pursuant to the Clinic Act, "[a] charge or reimbursement claim made by or on behalf of a clinic that is required to be licensed . . . but that is not so licensed, or that is otherwise operating in violation of this part . . . is an unlawful charge" and is ineligible for payment. By extension, "[a] person who knowingly makes or causes to be made an unlawful charge commits theft within the meaning of, and punishable as provided in, [Fla. Stat. §] 812.014."

36.     Thus, pursuant to both the No-Fault Law and the Clinic Act, clinics that operate in violation of the Clinic Act's licensing, medical director, or other operating requirements are not entitled to collect PIP Benefits, whether or not the underlying health care services were medically necessary or actually provided.

37.     Under the False and Fraudulent Insurance Claims Statute, it is unlawful for a health

care provider to engage in the general business practice of waiving – or failing to make a good-faith effort to collect – co-payments or deductibles from patients with PIP insurance.

38.     Failure to make a good-faith effort to collect co-payments or deductibles renders the charges submitted by a health care provider unlawful and noncompensable.

39.     Prior to January 1, 2013, the No-Fault Law permitted health care services providers, including clinics operating pursuant to the Clinic Act, to collect PIP Benefits for massage therapy or for services performed by massage therapists, so long as – among other things – the massage therapy was "provided, supervised, ordered, or prescribed by a licensed physician, chiropractor, or dentist, or was provided in a properly licensed or accredited institutional setting."

40.     However, the No-Fault Law was amended, effective January 1, 2013, to prohibit reimbursement for massage or for services rendered by massage therapists, regardless of any other kinds of health care licenses the massage therapists may have, and regardless of whether the massage therapists work under the supervision of other licensed health care practitioners.

41.     The No-Fault Law was amended to prohibit reimbursement for massage or for services performed by massage therapists in response to widespread PIP fraud involving massage services and massage therapists.

42.     Pursuant to the Physical Therapy Act, massage therapists may not practice physical therapy, or hold themselves out as being able to practice physical therapy, unless they have an actual license to practice physical therapy, as opposed to massage therapy.

43.     The Physical Therapy Act also prohibits unlicensed individuals from practicing physical therapy. While the Physical Therapy Act does provide an exception to this rule, which permits a physical therapist to delegate certain patient care activities to an unlicensed assistant, this exception only applies if the unlicensed assistant works under the direct supervision of a

physical therapist.

44.     Health care practices in Florida may not collect PIP Benefits for: (i) massage; (ii) any services performed by massage therapists; or (iii) physical therapy services that are performed by unlicensed individuals without direct supervision by a licensed physical therapist. Thus, any such charges submitted by a health care provider are unlawful and noncompensable.

45.     Pursuant to the No-Fault Law, insurers such as GEICO are not required to pay PIP Benefits:

(i)     for any service or treatment that is "upcoded", meaning that it is billed using a billing code that would result in payment greater in amount than would be paid by using a billing code that accurately describes the services performed;

(ii)    to any person who knowingly submits a false or misleading statement relating to the claim or charges; or

(iii)   with respect to a bill or statement that does not substantially meet the billing requirements as set forth in the No-Fault Law.

46.     The No-Fault Law's billing requirements provide – among other things – that all PIP billing must, to the extent applicable, comply with the instructions promulgated by the Centers for Medicare and Medicaid Services ("CMS") for the completion of HCFA-1500 forms, as well as the guidelines promulgated by the American Medical Association ("AMA") in connection with the use of current procedural terminology ("CPT") codes that are used to bill for health care services.

47.     In turn, the instructions promulgated by CMS for the completion of HCFA-1500 forms require, among other things, that all HCFA-1500 forms set forth – in Box 31 – the identity of the individual health care practitioner who personally performed or directly supervised the underlying health care services.

48.     To "directly supervise" a service, a supervising health care practitioner "must be

present in the office suite and [be] immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician (or other supervising practitioner) must be present in the room when the procedure is performed."

49. Additionally, pursuant to the No-Fault Law, in order for a health care service to be eligible for PIP reimbursement, the applicable HCFA-1500 claim form must set forth the professional license number of the practitioner who personally performed or directly supervised the underlying health care service, in the line or space provided for "Signature of Physician or Supplier, Including Degrees or Credentials."

50. Insurers are not required to pay PIP Benefits to health care providers that misrepresent, in their billing, the identity of the individual health care practitioners who performed or directly supervised the underlying services.

## II. The Defendants' Interrelated Fraudulent and Unlawful Schemes

51. Since at least 2019 and continuing through the present, the Defendants conceived and implemented interrelated fraudulent schemes in which they billed GEICO millions of dollars – or caused GEICO to be billed millions of dollars – for unlawful, medically unnecessary, illusory, and otherwise non-reimbursable services.

52. In the claims identified in Exhibits "1" - "4", almost none of the insureds whom the Defendants purported to treat suffered from any significant injuries or health problems as the result of the relatively minor automobile accidents they experienced that would necessitate the treatments that the Defendants purported to provide.

53. Even so, in the claims identified in Exhibits "1" - "4", the Defendants purported to subject virtually every insured to a medically unnecessary course of "treatment" that was provided pursuant to pre-determined, fraudulent protocols designed to maximize the billing that the

Defendants could submit to insurers – including GEICO – rather than to provide medically necessary treatment to the insureds who purportedly received and were subjected to this "treatment".

54.     The Defendants provided their pre-determined and fraudulent treatment protocols to the insureds in the claims identified in Exhibits "1" - "4" without regard for the insureds' individual symptoms or presentation – or, in most cases, the total absence of any continuing medical problems arising from any actual automobile accidents.

55.     Each step in the Defendants' fraudulent treatment protocols was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, thereby permitting the Defendants to generate and falsely justify the maximum amount of fraudulent PIP billing for each insured.

56.     No legitimate physician, clinic, or other health care provider would permit the fraudulent treatment and billing protocols described herein to proceed under their auspices.

57.     The Defendants permitted the fraudulent treatment and billing protocols described herein to proceed under their auspices because: (i) the Clinic Defendants were, at all relevant times, operating in violation of the Clinic Act, without legitimate oversight and without medical directors who legitimately fulfilled their statutory duties as medical directors; and (ii) the Defendants sought to profit from the fraudulent and unlawful billing that they submitted to GEICO and other insurers.

**A.     The Unlawful Operation of the Clinic Defendants in Violation of the Clinic Act**

58.     As part of the Defendants' fraudulent and unlawful schemes, the Clinic Defendants operated in pervasive violation of the Clinic Act and Florida law.

59.     Because CIMA, CIMA Miami Springs, Castellon, and Community Choice were all health care clinics subject to the Clinic Act: (i) Infante and Cisneros could not lawfully operate

CIMA and CIMA Miami Springs; (ii) Perez could not lawfully operate Castellon; and (iii) Garcia Prada could not lawfully operate Community Choice, unless the respective Clinic Defendants employed licensed physicians as their respective medical directors, who actually performed the required duties of clinic medical directors.

60.     However, if Infante and Cisneros, Perez, and Garcia Prada recruited legitimate physicians to serve as the legitimate medical directors at CIMA and CIMA Miami Springs, Castellon, and Community Choice, respectively, the physicians actually would be obligated to fulfill the statutory requirements applicable to clinic medical directors. By extension, any such legitimate medical directors would impede Infante and Cisneros, Perez, and Garcia Prada from using CIMA and CIMA Miami Springs, Castellon, and Community Choice, respectively, as vehicles to submit large amounts of fraudulent and unlawful PIP billing to GEICO and other Florida automobile insurers.

61.     Accordingly, Infante and Cisneros, Perez, and Garcia Prada all required physicians willing to falsely pose as the "medical directors" at CIMA and CIMA Miami Springs, Castellon, and Community Choice, respectively, but who – in actuality – would not fulfill and would not even attempt to fulfill the statutory requirements applicable to clinic medical directors, and thereby permit Infante and Cisneros, Perez, and Garcia Prada to use CIMA and CIMA Miami Springs, Castellon, and Community Choice, respectively, as vehicles to submit a large amount of fraudulent and unlawful PIP billing to GEICO and other insurers.

62.     Therefore:

(i)     Infante and Cisneros retained Abraham, a licensed physician, who – in exchange for compensation – was willing to falsely pose as the legitimate medical director of CIMA.

(ii)    Infante and Cisneros retained Casta, a licensed physician, who – in exchange for compensation – was willing to falsely pose as the legitimate medical director of

CIMA Miami Springs.

(iii)     Perez retained Casta, a licensed physician, who – in exchange for compensation – was willing to falsely pose as the legitimate medical director of Castellon.

(iv)     Garcia Prada retained Casta, a licensed physician, who – in exchange for compensation – was willing to falsely pose as the legitimate medical director of Community Choice.

63.     In order to circumvent Florida law and induce the AHCA to maintain the licensure of CIMA, CIMA Miami Springs, Castellon, and Community Choice, and to permit CIMA, CIMA Miami Springs, Castellon, and Community Choice to operate as clinics: (i) Infante and Cisneros entered into a secret agreement with Abraham; and (ii) Infante and Cisneros, Perez, and Garcia Prada entered into separate, respective secret agreements with Casta.

64.     In exchange for compensation from Infante, Cisneros, and CIMA, Abraham agreed to falsely represent – to the AHCA; to the insureds who sought treatment at CIMA; and to the insurers, including GEICO, that received PIP claims from CIMA – that he was the true medical director at CIMA, and that at CIMA he truly fulfilled the statutory requirements applicable to clinic medical directors.

65.     In exchange for compensation from Infante, Cisneros, and CIMA Miami Springs; Perez and Castellon; and Garcia Prada and Community Choice, Casta agreed to falsely represent – to the AHCA; to the insureds who sought treatment at CIMA Miami Springs, Castellon, and Community Choice; and to the insurers, including GEICO, that received PIP claims from CIMA Miami Springs, Castellon, and Community Choice – that she was the true medical director at CIMA Miami Springs, Castellon, and Community Choice, and that at CIMA Miami Springs, Castellon, and Community Choice she truly fulfilled the statutory requirements applicable to clinic medical directors.

66.     However, Abraham never genuinely served as medical director at CIMA, and Casta

never genuinely served as medical director at CIMA Miami Springs, Castellon, and Community Choice. Instead, from the beginning of Abraham's association with CIMA as its purported "medical director", and from the beginning of Casta's association with CIMA Miami Springs, Castellon, and Community Choice as their purported "medical director": (i) Abraham ceded true decision-making authority regarding health care services at CIMA – and the resulting billing – to Infante and Cisneros; and (ii) Casta ceded true decision-making authority regarding health care services at CIMA Miami Springs, Castellon, and Community Choice – and the resulting billing – to Infante and Cisneros, Perez, and Garcia Prada, respectively.

67.     Abraham never legitimately served as medical director at CIMA, inasmuch as he: (i) never conducted systematic reviews of CIMA's billings to ensure that the billings were not fraudulent or unlawful; (ii) never ensured that all treating practitioners at CIMA were properly licensed; and (iii) never even made any attempt to discover the fraudulent and unlawful charges submitted through CIMA – much less take any corrective action – and instead permitted CIMA to operate in the fraudulent and unlawful manner set forth herein.

68.     Casta never legitimately served as medical director at CIMA Miami Springs, Castellon, and Community Choice, inasmuch as she: (i) never conducted systematic reviews of CIMA Miami Springs, Castellon, and Community Choice's respective billings to ensure that the billings were not fraudulent or unlawful; (ii) never ensured that all treating practitioners at CIMA Miami Springs, Castellon, and Community Choice were properly licensed; and (iii) never even made any attempt to discover the fraudulent and unlawful charges submitted through CIMA Miami Springs, Castellon, and Community Choice – much less take any corrective action – and instead permitted CIMA Miami Springs, Castellon, and Community Choice to operate in the fraudulent and unlawful manner set forth herein.

69.     What is more, though no Florida health care clinic may operate without the day-to-day supervision of a physician-medical director, Abraham never provided legitimate, day-to-day supervision at CIMA, and Casta never provided legitimate, day-to-day supervision at CIMA Miami Springs, Castellon, and Community Choice, and – in fact – both Abraham and Casta were only occasionally present at their respective clinics, if at all.

70.     For example, CIMA's AHCA clinic licensing application forms – which were submitted under the penalties of perjury – indicated that Abraham was only present at CIMA one day per month.

71.     Similarly, CIMA Miami Springs, Castellon, and Community Choice's respective AHCA clinic licensing application forms – which were submitted under the penalties of perjury – indicated the Casta was only present at CIMA Miami Springs, Castellon, and Community Choice one day per month.

72.     Had Abraham legitimately served as CIMA's medical director, he would have noted, among other things, that CIMA was – as set forth herein – operating in pervasive violation of the Clinic Act, the False and Fraudulent Insurance Claims Statute, the Physical Therapy Act, and the No-Fault Law.

73.     Had Casta legitimately served as CIMA Miami Springs, Castellon, and Community Choice's medical director, she would have noted, among other things, that CIMA Miami Springs, Castellon, and Community Choice were – as set forth herein – operating in pervasive violation of the Clinic Act, the False and Fraudulent Insurance Claims Statute, the Physical Therapy Act, and the No-Fault Law.

74.     In fact, true authority over the provision of health care services and the resulting billing submitted through CIMA and CIMA Miami Springs, Castellon, and Community Choice –

including the authority that would, at a legitimate clinic, be vested in the medical director – was held at all times by Infante and Cisneros, Perez, and Garcia Prada, respectively.

75.     Abraham unlawfully permitted Infante and Cisneros to dictate the manner in which insureds would be treated at CIMA, and to dictate the manner in which health care services at CIMA would be billed to GEICO and other insurers, because he wanted to continue profiting through CIMA's fraudulent and unlawful billing.

76.     Casta unlawfully permitted Infante and Cisneros, Perez, and Garcia Prada to dictate the manner in which insureds would be treated at CIMA Miami Springs, Castellon, and Community Choice, respectively, and to dictate the manner in which health care services at CIMA Miami Springs, Castellon, and Community Choice would be billed to GEICO and other insurers, because she wanted to continue profiting through CIMA Miami Springs, Castellon, and Community Choice's fraudulent and unlawful billing.

77.     Infante and Cisneros used the façade of Abraham's "appointment" as the purported "medical director" at CIMA to do what they were forbidden from doing – namely: (i) operate a clinic without a legitimate medical director; (ii) engage in unlicensed medical decision-making with respect to the insureds who sought treatment at CIMA; and (iii) use CIMA as a vehicle to submit large amounts of fraudulent and unlawful PIP billing to GEICO and other insurers.

78.     Infante and Cisneros, Perez, and Garcia Prada used the façade of Casta's "appointment" as the purported "medical director" at CIMA Miami Springs, Castellon, and Community Choice, respectively, to do what they were forbidden from doing – namely: (i) operate clinics without legitimate medical directors; (ii) engage in unlicensed medical decision-making with respect to the insureds who sought treatment at CIMA Miami Springs, Castellon, and Community Choice, respectively; and (iii) use CIMA Miami Springs, Castellon, and Community

Choice, respectively, as vehicles to submit large amounts of fraudulent and unlawful PIP billing to GEICO and other insurers.

**B.    The Fraudulent and Unlawful Claims for Initial Examinations at CIMA, CIMA Miami Springs, and Castellon**

79.    As an initial step in the their fraudulent treatment and billing protocols, Casta, CIMA, Abraham, CIMA Miami Springs, Infante, Cisneros, Castellon, and Perez (collectively the "Examination Defendants") purported to provide virtually all of the insureds in the claims identified in Exhibits "1" - "3" with an initial examination.

80.    As set forth in Exhibit "1", CIMA, Casta, Abraham, Infante, and Cisneros (collectively the "CIMA Defendants") billed the initial examinations to GEICO under: (i) CPT code 99203, typically resulting in a charge of $400.00 for each initial examination they purported to provide; and (ii) CPT code 99204, typically resulting in a charge of $450.00 for each initial examination they purported to provide.

81.    As set forth in Exhibit "2", CIMA Miami Springs, Casta, Infante, and Cisneros (collectively the "CIMA Miami Springs Defendants") billed the initial examinations to GEICO under: (i) CPT code 99203, typically resulting in a charge of $400.00 for each initial examination they purported to provide; and (ii) CPT code 99204, typically resulting in a charge of $450.00 for each initial examination they purported to provide.

82.    As set forth in Exhibit "3", Castellon, Casta, and Perez (collectively the "Castellon Defendants") billed the initial examinations to GEICO under CPT code 99203, typically resulting in a charge of $300.00 or $350.00 for each initial examination they purported to provide.

83.    In the claims for initial examinations identified in Exhibits "1" - "3", the charges for initial examinations were fraudulent in that they misrepresented the Examination Defendants' eligibility to collect PIP Benefits in the first instance.

84.     In fact, and as set forth herein, the Examination Defendants were never eligible to collect PIP Benefits, inasmuch as CIMA, CIMA Miami Springs, and Castellon operated in pervasive violation of Florida law.

85.     Moreover, and as set forth herein, the charges for initial examinations identified in Exhibits "1" - "3" were also fraudulent in that they misrepresented the nature, extent, and results of the initial examinations.

**1.      Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

86.     As set forth herein, the No-Fault Law's billing requirements provide that all PIP billing must – among other things – comply with the guidelines promulgated by the AMA in connection with the use of CPT codes.

87.     The primary guidelines promulgated by the AMA for the use of CPT codes are contained in the AMA's CPT Assistant.

88.     Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for an initial patient examination represents that the insured presented with problems of moderate severity.

89.     The CPT Assistant provides various clinical examples of moderate severity presenting problems that would support the use of CPT code 99203 to bill for an initial patient examination:

(i)      Office visit for initial evaluation of a 48-year-old man with recurrent low back pain radiating to the leg. (General Surgery)

(ii)     Initial office evaluation of a 49-year-old male with nasal obstruction. Detailed exam with topical anesthesia. (Plastic Surgery)

(iii)    Initial office evaluation for diagnosis and management of painless gross hematuria in new patient, without cystoscopy. (Internal Medicine)

(iv)    Initial office visit for evaluation of 13-year-old female with progressive scoliosis. (Physical Medicine and Rehabilitation)

(v) Initial office visit with couple for counseling concerning voluntary vasectomy for sterility. Spent 30 minutes discussing procedure, risks and benefits, and answering questions. (Urology)

90.     Accordingly, pursuant to the CPT Assistant, the moderate severity presenting problems that could support the use of CPT code 99203 to bill for an initial patient examination typically are either chronic and relatively serious problems, acute problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

91.     Similarly, pursuant to the CPT Assistant, the use of CPT code 99204 to bill for an initial patient examination represents that the insured presented with problems of moderate to high severity.

92.     The CPT Assistant provides the following clinical examples of moderate to high severity presenting problems that would support the use of CPT code 99204 to bill for an initial patient examination:

(i) Office visit for initial evaluation of a 63-year-old male with chest pain on exertion. (Cardiology/Internal Medicine)

(ii) Initial office visit of a 50-year-old female with progressive solid food dysphagia. (Gastroenterology)

(iii) Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion. (Internal Medicine)

(iv) Initial office visit for a 34-year-old patient with primary infertility, including counseling. (Obstetrics/Gynecology)

(v) Initial office visit for a 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization times three. (Pediatrics)

(vi) Initial office evaluation of a 70-year-old female with polyarthralgia. (Rheumatology)

(vii) Initial office evaluation of a 50-year-old male with an aortic aneurysm with respect to recommendation for surgery. (Thoracic Surgery)

93.     Accordingly, pursuant to the CPT Assistant, the moderate to high severity

presenting problems that could support the use of CPT code 99204 to bill for an initial patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

94.     By contrast, to the extent that the insureds in the claims identified in Exhibits "1" - "3" had any presenting problems at all as the result of their typically minor automobile accidents, the problems virtually always were minimal severity soft tissue injuries such as sprains and strains.

95.     For instance, and in keeping with the fact that the insureds in the claims identified in Exhibits "1" - "3"  either had no presenting problems at all as the result of their minor automobile accidents, or else had problems of minimal severity, in the substantial majority of the claims identified in Exhibits "1" - "3", the insureds did not seek treatment at any hospital as the result of their accidents.

96.     To the limited extent that the insureds in the claims identified in Exhibits "1" - "3" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis, and were discharged with nothing more serious than a minor soft tissue injury diagnosis such as a sprain or strain.

97.     Furthermore, in most of the claims identified in Exhibits "1" - "3", the contemporaneous police reports indicate that the insureds' vehicles were functional following the accidents, and that no one was seriously injured in their accidents – or injured at all.

98.     Even so, in the claims for initial examinations identified in Exhibits "1" - "3", the Examination Defendants routinely billed for their putative initial examinations using CPT codes 99203 and 99204, and thereby falsely represented that the insureds presented with problems of moderate severity and moderate to high severity, respectively.

99.     For example:

(i)     On November 4, 2020, an insured named GM was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to GM's vehicle, that there was minor damage to the other vehicle, and that GM's vehicle was drivable following the accident. The police report further indicated that GM was not injured and that GM did not complain of any pain at the scene. In keeping with the fact that GM was not seriously injured, GM did not visit any hospital emergency room following the accident. To the extent that GM experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of GM on November 9, 2020, the Castellon Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(ii)    On January 3, 2021, an insured named JH was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to JH's vehicle, that there was minor damage to the other vehicle, and that JH's vehicle was drivable following the accident. The police report further indicated that JH was not injured and that JH did not complain of any pain at the scene. In keeping with the fact that JH was not seriously injured, JH did not visit any hospital emergency room following the accident. To the extent that JH experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of JH on January 5, 2021, the Castellon Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(iii)   On January 3, 2021, an insured named JB was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to JB's vehicle, that there was minor damage to the other vehicle, and that JB's vehicle was drivable following the accident. The police report further indicated that JB was not injured and that JB did not complain of any pain at the scene. In keeping with the fact that JB was not seriously injured, JB did not visit any hospital emergency room following the accident. To the extent that JB experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of JB on January 6, 2021, the Castellon Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(iv)    On October 14, 2021, an insured named LH was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to LH's vehicle, that there was minor damage to the other vehicle, and that LH's vehicle was drivable following the accident. The police report further indicated that LH was not injured and that LH did not complain of any pain at the scene. In keeping with the fact that LH was not seriously injured, LH did not visit any hospital emergency room following the accident. To the extent that LH

experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of LH on October 19, 2021, the Castellon Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(v)     On December 13, 2021, an insured named VP was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to VP's vehicle, that there was minor damage to the other vehicle, and that VP's vehicle was drivable following the accident. The police report further indicated that VP was not injured and that VP did not complain of any pain at the scene. In keeping with the fact that VP was not seriously injured, VP did not visit any hospital emergency room following the accident. To the extent that VP experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of VP on December 20, 2021, the CIMA Defendants billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(vi)    On March 11, 2022, an insured named JH was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to JH's vehicle, that there was minor damage to the other vehicle, and that JH's vehicle was drivable following the accident. The police report further indicated that JH was not injured and that JH did not complain of any pain at the scene. In keeping with the fact that JH was not seriously injured, JH did not visit any hospital emergency room following the accident. To the extent that JH experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of JH on April 11, 2022, the CIMA Defendants billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(vii)   On April 11, 2022, an insured named BR was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to BR's vehicle, that there was minor damage to the other vehicle, and that BR's vehicle was drivable following the accident. The police report further indicated that BR was not injured and that BR did not complain of any pain at the scene. In keeping with the fact that BR was not seriously injured, BR did not visit any hospital emergency room following the accident. To the extent that BR experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of BR on April 16, 2022, the CIMA Defendants billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(viii)  On April 19, 2022, an insured named VS was involved in an automobile accident.

The contemporaneous police report indicated that there was minor damage to VS's vehicle, that there was minor damage to the other vehicle, and that VS's vehicle was drivable following the accident. The police report further indicated that VS was not injured and that VS did not complain of any pain at the scene. In keeping with the fact that VS was not seriously injured, VS did not visit any hospital emergency room following the accident. To the extent that VS experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of VS on June 2, 2022, the CIMA Defendants billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(ix)     On August 19, 2022, an insured named SP was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to SP's vehicle, that there was minor damage to the other vehicle, and that SP's vehicle was drivable following the accident. The police report further indicated that SP was not injured and that SP did not complain of any pain at the scene. In keeping with the fact that SP was not seriously injured, SP did not visit any hospital emergency room following the accident. To the extent that SP experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of SP on September 24, 2022, the CIMA Miami Springs Defendants billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(x)      On August 22, 2022, an insured named CA was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to CA's vehicle, that there was minor damage to the other vehicle, and that CA's vehicle was drivable following the accident. The police report further indicated that CA was not injured and that CA did not complain of any pain at the scene. In keeping with the fact that CA was not seriously injured, CA did not visit any hospital emergency room following the accident. To the extent that CA experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of CA on September 15, 2022, the CIMA Miami Springs Defendants billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xi)     On August 31, 2022, an insured named AS was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to AS's vehicle, that there was minor damage to the other vehicle, and that AS's vehicle was drivable following the accident. The police report further indicated that AS was not injured and that AS did not complain of any pain at the scene. In keeping with the fact that AS was not seriously injured, AS did not visit any hospital emergency room following the accident. To the extent that AS experienced any health problems at all as the result of the accident, they were of minimal severity. Even

so, following a purported initial examination of AS on September 16, 2022, the CIMA Miami Springs Defendants billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xii)   On September 17, 2022, an insured named BR was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to BR's vehicle, that there was minor damage to the other vehicle, and that BR's vehicle was drivable following the accident. The police report further indicated that BR was not injured and that BR did not complain of any pain at the scene. In keeping with the fact that BR was not seriously injured, BR did not visit any hospital emergency room following the accident. To the extent that BR experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of BR on September 23, 2022, the CIMA Miami Springs Defendants billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xiii)  On September 20, 2022, an insured named CD was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to CD's vehicle, that there was minor damage to the other vehicle, and that CD's vehicle was drivable following the accident. The police report further indicated that CD was not injured and that CD did not complain of any pain at the scene. In keeping with the fact that CD was not seriously injured, CD did not visit any hospital emergency room following the accident. To the extent that CD experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of CD on September 21, 2022, the Castellon Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xiv)   On October 10, 2022, an insured named JG was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to JG's vehicle, that there was minor damage to the other vehicle, and that JG's vehicle was drivable following the accident. The police report further indicated that JG was not injured and that JG did not complain of any pain at the scene. In keeping with the fact that JG was not seriously injured, JG did not visit any hospital emergency room following the accident. To the extent that JG experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of JG on November 3, 2022, the CIMA Defendants billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xv)    On October 23, 2022, an insured named MC was involved in an automobile accident. The contemporaneous police report indicated that there was minor

damage to MC's vehicle, that there was minor damage to the other vehicle, and that MC's vehicle was drivable following the accident. The police report further indicated that MC was not injured and that MC did not complain of any pain at the scene. In keeping with the fact that MC was not seriously injured, MC did not visit any hospital emergency room following the accident. To the extent that MC experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of MC on November 23, 2022, the CIMA Defendants billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xvi)   On February 4, 2023, an insured named LS was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to LS's vehicle, that there was minor damage to the other vehicle, and that LS's vehicle was drivable following the accident. The police report further indicated that LS was not injured and that LS did not complain of any pain at the scene. In keeping with the fact that LS was not seriously injured, LS did not visit any hospital emergency room following the accident. To the extent that LS experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of LS on February 10, 2023, the CIMA Miami Springs Defendants billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xvii)  On October 11, 2023, an insured named KR was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to KR's vehicle, that there was minor damage to the other vehicle, and that KR's vehicle was drivable following the accident. The police report further indicated that KR was not injured and that KR did not complain of any pain at the scene. In keeping with the fact that KR was not seriously injured, KR did not visit any hospital emergency room following the accident. To the extent that KR experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of KR on October 31, 2023, the CIMA Defendants billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xviii) On February 5, 2024, an insured named RM was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to RM's vehicle, that there was minor damage to the other vehicle, and that RM's vehicle was drivable following the accident. The police report further indicated that RM was not injured and that RM did not complain of any pain at the scene. In keeping with the fact that RM was not seriously injured, RM did not visit any hospital emergency room following the accident. To the extent that RM experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of RM on

February 15, 2024, the Castellon Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xix)  On February 5, 2024, an insured named RL was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to RL's vehicle, that there was minor damage to the other vehicle, and that RL's vehicle was drivable following the accident. The police report further indicated that RL was not injured and that RL did not complain of any pain at the scene. In keeping with the fact that RL was not seriously injured, RL did not visit any hospital emergency room following the accident. To the extent that RL experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of RL on February 15, 2024, the Castellon Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xx)  On July 28, 2024, an insured named MS was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to MS's vehicle, that there was minor damage to the other vehicle, and that MS's vehicle was drivable following the accident. The police report further indicated that MS was not injured and that MS did not complain of any pain at the scene. In keeping with the fact that MS was not seriously injured, MS did not visit any hospital emergency room following the accident. To the extent that MS experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of MS on August 5, 2024, the Castellon Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

100.  These are only representative examples. In the claims for initial examinations identified in Exhibits "1" - "3", the Examination Defendants virtually always falsely represented that the insureds presented with problems of moderate severity or moderate to high severity, when, in fact, the insureds' problems were minimal severity soft tissue injuries such as sprains and strains, to the limited extent that the insureds had any presenting problems at all as the result of their minor automobile accidents.

101.  In the claims for initial examinations identified in Exhibits "1" - "3", the Examination Defendants virtually always falsely represented that the insureds presented with

problems of moderate severity or moderate to high severity in order to create a false basis for their charges for examinations billed under CPT codes 99203 and 99204, because the Examination Defendants were aware that examinations billable under CPT codes 99203 and 99204 are reimbursable at higher rates than examinations involving presenting problems of low severity, minimal severity, or no severity.

102.    In the claims for initial examinations identified in Exhibits "1" - "3", the Examination Defendants also virtually always falsely represented that the insureds presented with problems of moderate severity or moderate to high severity in order to create a false basis for the laundry list of other Fraudulent Services that the Defendants purported to provide to the insureds, including medically unnecessary physical therapy and chiropractic, pain management injections, HME, and related services and goods.

**2.    Misrepresentations Regarding the Amount of Time Spent on the Initial Examinations**

103.    What is more, in every claim identified in Exhibits "1" - "3" for initial examinations billed under CPT codes 99203 and 99204, the Examination Defendants misrepresented and exaggerated the total amount of time that the examining practitioners spent performing the putative initial examinations.

104.    Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for an initial examination represents that the physician or other practitioner who performed the examination spent at least 30 minutes of time performing the examination.

105.    When the Examination Defendants billed GEICO for their purported initial examinations using CPT code 99203, they represented that the examining practitioners spent at least 30 minutes of time performing the examinations of the insureds.

106.    Similarly, pursuant to the CPT Assistant, the use of CPT code 99204 to bill for an

initial examination represents that the physician or other practitioner who performed the examination spent at least 45 minutes of time performing the examination.

107.    When the Examination Defendants billed GEICO for their purported initial examinations using CPT code 99204, they represented that the examining practitioners spent at least 45 minutes of time performing the examinations of the insureds.

108.    In fact, in the claims for initial examinations identified in Exhibits "1" - "3", neither Casta, nor Abraham, nor any other examining health care practitioner spent even 15 minutes of time performing the examinations of the insureds – much less 30 or 45 minutes – to the extent that the examinations were actually conducted at all.

109.    In keeping with the fact that the initial examinations in the claims identified in Exhibits "1" - "3" did not involve more than 15 minutes of time performing the examinations, the examining practitioners used templated forms in purporting to conduct the examinations.

110.    All that was required to complete the templated forms was a brief patient interview and a perfunctory physical examination of the insureds, consisting of a check of some of the insureds' vital signs and a limited check of the insureds' systems.

111.    These interviews and examinations did not require Casta, Abraham, or any other examining health care practitioner to spend more than 15 minutes of time performing the putative initial examinations.

112.    In the claims for initial examinations identified in Exhibits "1" - "3", the Examination Defendants routinely misrepresented the amount of time that was spent in conducting the initial examinations of the insureds, because lengthier examinations that are billable under CPT codes 99203 and 99204 are reimbursable at higher rates than examinations that take less time to perform.

3. **Misrepresentations Regarding the Extent of Medical Decision-Making During the Initial Examinations**

113.    Pursuant to the CPT Assistant, there are four potential levels of medical decision-making in which a health care practitioner can engage in connection with an initial patient examination, namely straightforward, low complexity, moderate complexity, and high complexity medical decision-making.

114.    Pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information to be considered; and (iii) the risk of complications, morbidity, and mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

115.    Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represents that the physician or health care practitioner who performed the examination engaged in legitimate "low complexity" medical decision-making in connection with the examination.

116.    For an initial patient examination to legitimately entail "low complexity" medical decision-making, the examination typically must, among other things: (i) involve review and analysis of some of the patient's medical records or information regarding the patient's history obtained from an independent historian; and (ii) there typically must be at least some real risk of morbidity associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options for the patient.

117.    Moreover, pursuant to the CPT Assistant, the use of CPT code 99204 to bill for a patient examination represents that the physician or health care practitioner who performed the

examination engaged in legitimate "moderate complexity" medical decision-making in connection with the examination.

118.    For an initial patient examination to legitimately entail "moderate complexity" medical decision-making, the examination typically must – among other things – involve: (i) chronic illness, acute illness with systemic symptoms or complications, or an undiagnosed problem with an uncertain prognosis; (ii) review and analysis of a larger amount of the patient's medical records/history than would be required to satisfy "low complexity" medical decision-making; and (iii) at least a moderate risk of morbidity associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options for the patient.

119.    As set forth above and in Exhibits "1" - "3", the Examination Defendants billed GEICO for virtually all of their putative initial patient examinations of insureds using CPT codes 99203 and 99204, and thereby falsely represented that the examining practitioners engaged in genuine low complexity medical decision-making or moderate complexity medical decision-making, respectively, in connection with the initial examinations.

120.    In fact, to the extent that the insureds in the claims identified in Exhibits "1" - "3" had any presenting problems at all as the result of their minor automobile accidents, the problems virtually always were minor soft tissue injuries such as sprains and strains.

121.    The diagnosis and treatment of these minor soft tissue injuries did not require any legitimate low complexity medical decision-making, or any legitimate moderate complexity medical decision-making.

122.    First, in the Examination Defendants' claims for initial examinations identified in Exhibits "1" - "3", the initial examinations did not involve the retrieval, review, or analysis of any significant amount of medical records, diagnostic tests, or other information.

32

123.     When the insureds in the claims identified in Exhibits "1" - "3" presented to the Examination Defendants for "treatment", they did not arrive with any significant medical records.

124.     Furthermore, prior to the initial examinations, the Examination Defendants and their associates did not request any significant medical records from any other providers regarding the insureds, nor did they provide, review, or analyze any complex diagnostic tests or other information in connection with the examinations.

125.     Second, in the Examination Defendants' claims for initial examinations identified in Exhibits "1" - "3", there was no risk of significant complications or morbidity – much less mortality – from the insureds' minor soft tissue complaints, to the extent that the insureds had any complaints arising from their minor automobile accidents at all.

126.     Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by the Examination Defendants during the initial examinations, to the extent that the Examination Defendants provided any such diagnostic procedures or treatment options in the first instance.

127.     In virtually all of the claims identified in Exhibits "1" - "3", any diagnostic procedures and treatment options that the Examination Defendants recommended or provided during the initial examinations were limited to a series of medically unnecessary physical therapy and chiropractic, pain management injections, HME, and related services and goods – none of which was health- or life-threatening if properly administered.

128.     Third, in the claims for initial examinations identified in Exhibits "1" - "3", the examining practitioners did not consider any significant number of diagnoses or treatment options for insureds during the initial examinations.

129.     Rather, to the extent that the initial examinations were conducted in the first

instance, the examining practitioners – at the direction of the Examination Defendants – provided a substantially similar, pre-determined, and false series of soft tissue injury "diagnoses" for each insured, and prescribed a virtually identical course of medically unnecessary treatment for each insured.

130.    Specifically, in almost every instance in the claims identified in Exhibits "1" - "3", during the initial examinations, the insureds did not report any serious continuing medical problems that legitimately could be traced to an underlying automobile accident.

131.    Even so, the examining practitioners – at the direction of the Examination Defendants – prepared initial examination reports in which they provided false, boilerplate sprain/strain and similar soft tissue "diagnoses" to virtually every insured.

132.    Then, based upon these artificial "diagnoses", the examining practitioners – at the direction of the Examination Defendants – falsely diagnosed virtually every insured in the claims identified in Exhibits "1" - "3" with a purported "emergency medical condition", and then directed the insureds to receive a series of medically unnecessary physical therapy and chiropractic, pain management injections, HME, and related services and goods.

133.    Contrary to the Examination Defendants' false diagnoses, the insureds in the claims identified in Exhibits "1" - "3" did not legitimately suffer from any "emergency medical conditions" – or any significant health care problems at all – as the result of their typically minor automobile accidents.

134.    For example:

(i)    On November 4, 2020, an insured named GM was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to GM's vehicle, that there was minor damage to the other vehicle, and that GM's vehicle was drivable following the accident. The police report further indicated that GM was not injured and that GM did not complain of any pain at the scene. In keeping with the fact that GM was not seriously injured, GM did not visit

any hospital emergency room following the accident. To the extent that GM experienced any health problems at all as a result of the accident, they were of minimal severity, and did not constitute any kind of "emergency medical condition". On November 9, 2020, GM purportedly received an initial examination at Castellon. To the extent that the examination was performed in the first instance, the examining practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the examining practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, the examining practitioner – at the direction of the Castellon Defendants – provided GM with a false list of objectively unverifiable soft tissue injury "diagnoses", and then an advanced practice registered nurse named Laura Gutierrez, A.P.R.N. ("Gutierrez") falsely diagnosed GM with a purported "emergency medical condition". Furthermore, neither GM's presenting problems nor the treatment plan provided to GM by the Castellon Defendants presented any risk of significant complications, morbidity, or mortality. To the contrary, GM did not need any significant treatment at all as a result of the accident, and the treatment plan provided by the Castellon Defendants consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to GM. Even so, the Castellon Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the examination entailed some legitimate, low complexity medical decision-making.

(ii)     On January 3, 2021, an insured named JH was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to JH's vehicle, that there was minor damage to the other vehicle, and that JH's vehicle was drivable following the accident. The police report further indicated that JH was not injured and that JH did not complain of any pain at the scene. In keeping with the fact that JH was not seriously injured, JH did not visit any hospital emergency room following the accident. To the extent that JH experienced any health problems at all as a result of the accident, they were of minimal severity, and did not constitute any kind of "emergency medical condition". On January 5, 2021, JH purportedly received an initial examination at Castellon. To the extent that the examination was performed in the first instance, the examining practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the examining practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, the examining practitioner – at the direction of the Castellon Defendants – provided JH with a false list of objectively unverifiable soft tissue injury "diagnoses", and then Gutierrez falsely diagnosed JH with a purported "emergency medical condition". Furthermore, neither JH's presenting problems nor the treatment plan provided to JH by the Castellon Defendants presented any risk of significant complications, morbidity, or mortality. To the contrary, JH did not need any significant treatment at all as a result of the accident, and the treatment plan provided by the Castellon Defendants consisted of medically unnecessary physical therapy services, which did not pose

the least bit of risk to JH. Even so, the Castellon Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the examination entailed some legitimate, low complexity medical decision-making.

(iii)     On October 14, 2021, an insured named LH was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to LH's vehicle, that there was minor damage to the other vehicle, and that LH's vehicle was drivable following the accident. The police report further indicated that LH was not injured and that LH did not complain of any pain at the scene. In keeping with the fact that LH was not seriously injured, LH did not visit any hospital emergency room following the accident. To the extent that LH experienced any health problems at all as a result of the accident, they were of minimal severity, and did not constitute any kind of "emergency medical condition". On October 19, 2021, LH purportedly received an initial examination at Castellon. To the extent that the examination was performed in the first instance, the examining practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the examining practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, the examining practitioner – at the direction of the Castellon Defendants – provided LH with a false list of objectively unverifiable soft tissue injury "diagnoses", and then Gutierrez falsely diagnosed LH with a purported "emergency medical condition". Furthermore, neither LH's presenting problems nor the treatment plan provided to LH by the Castellon Defendants presented any risk of significant complications, morbidity, or mortality. To the contrary, LH did not need any significant treatment at all as a result of the accident, and the treatment plan provided by the Castellon Defendants consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to LH. Even so, the Castellon Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the examination entailed some legitimate, low complexity medical decision-making.

(iv)     On March 11, 2022, an insured named JH was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to JH's vehicle, that there was minor damage to the other vehicle, and that JH's vehicle was drivable following the accident. The police report further indicated that JH was not injured and that JH did not complain of any pain at the scene. In keeping with the fact that JH was not seriously injured, JH did not visit any hospital emergency room following the accident. To the extent that JH experienced any health problems at all as a result of the accident, they were of minimal severity, and did not constitute any kind of "emergency medical condition". On April 11, 2022, JH purportedly received an initial examination at CIMA. To the extent that the examination was performed in the first instance, the examining practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the examining practitioner did not consider any significant number of diagnoses or management

options in connection with the examination. Instead, the examining practitioner – at the direction of the CIMA Defendants – provided JH with a false list of objectively unverifiable soft tissue injury "diagnoses", and then Casta falsely diagnosed JH with a purported "emergency medical condition". Furthermore, neither JH's presenting problems nor the treatment plan provided to JH by the CIMA Defendants presented any risk of significant complications, morbidity, or mortality. To the contrary, JH did not need any significant treatment at all as a result of the accident, and the treatment plan provided by the CIMA Defendants consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to JH. Even so, the CIMA Defendants billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the examination entailed some legitimate, moderate complexity medical decision-making.

(v)     On June 2, 2022, an insured named NC was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to NC's vehicle, that there was minor damage to the other vehicle, and that NC's vehicle was drivable following the accident. The police report further indicated that NC was not injured and that NC did not complain of any pain at the scene. In keeping with the fact that NC was not seriously injured, NC did not visit any hospital emergency room following the accident. To the extent that NC experienced any health problems at all as a result of the accident, they were of minimal severity, and did not constitute any kind of "emergency medical condition". On September 30, 2022, NC purportedly received an initial examination at CIMA Miami Springs. To the extent that the examination was performed in the first instance, the examining practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the examining practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, the examining practitioner – at the direction of the CIMA Miami Springs Defendants – provided NC with a false list of objectively unverifiable soft tissue injury "diagnoses", and then Casta falsely diagnosed NC with a purported "emergency medical condition". Furthermore, neither NC's presenting problems nor the treatment plan provided to NC by the CIMA Miami Springs Defendants presented any risk of significant complications, morbidity, or mortality. To the contrary, NC did not need any significant treatment at all as a result of the accident, and the treatment plan provided by the CIMA Miami Springs Defendants consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to NC. Even so, the CIMA Miami Springs Defendants billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the examination entailed some legitimate, moderate complexity medical decision-making.

(vi)    On July 9, 2022, an insured named AG was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to AG's vehicle, that there was minor damage to the other vehicle, and that AG's vehicle

was drivable following the accident. The police report further indicated that AG was not injured and that AG did not complain of any pain at the scene. In keeping with the fact that AG was not seriously injured, AG did not visit any hospital emergency room following the accident. To the extent that AG experienced any health problems at all as a result of the accident, they were of minimal severity, and did not constitute any kind of "emergency medical condition". On November 12, 2022, AG purportedly received an initial examination at CIMA. To the extent that the examination was performed in the first instance, the examining practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the examining practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, the examining practitioner – at the direction of the CIMA Defendants – provided AG with a false list of objectively unverifiable soft tissue injury "diagnoses", and then Casta falsely diagnosed AG with a purported "emergency medical condition". Furthermore, neither AG's presenting problems nor the treatment plan provided to AG by the CIMA Defendants presented any risk of significant complications, morbidity, or mortality. To the contrary, AG did not need any significant treatment at all as a result of the accident, and the treatment plan provided by the CIMA Defendants consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to AG. Even so, the CIMA Defendants billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the examination entailed some legitimate, moderate complexity medical decision-making.

(vii)  On July 11, 2022, an insured named SM was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to SM's vehicle and that SM's vehicle was drivable following the accident. The police report further indicated that SM was not injured and that SM did not complain of any pain at the scene. In keeping with the fact that SM was not seriously injured, SM did not visit any hospital emergency room following the accident. To the extent that SM experienced any health problems at all as a result of the accident, they were of minimal severity, and did not constitute any kind of "emergency medical condition". On July 14, 2022, SM purportedly received an initial examination at CIMA Miami Springs. To the extent that the examination was performed in the first instance, the examining practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the examining practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, the examining practitioner – at the direction of the CIMA Miami Springs Defendants – provided SM with a false list of objectively unverifiable soft tissue injury "diagnoses", and then Casta falsely diagnosed SM with a purported "emergency medical condition". Furthermore, neither SM's presenting problems nor the treatment plan provided to SM by the CIMA Miami Springs Defendants presented any risk of significant complications, morbidity, or mortality. To the contrary, SM did not need any significant treatment at all as a

result of the accident, and the treatment plan provided by the CIMA Miami Springs Defendants consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to SM. Even so, the CIMA Miami Springs Defendants billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the examination entailed some legitimate, moderate complexity medical decision-making.

(viii)  On July 11, 2022, an insured named YM was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to YM's vehicle and that YM's vehicle was drivable following the accident. The police report further indicated that YM was not injured and that YM did not complain of any pain at the scene. In keeping with the fact that YM was not seriously injured, YM did not visit any hospital emergency room following the accident. To the extent that YM experienced any health problems at all as a result of the accident, they were of minimal severity, and did not constitute any kind of "emergency medical condition". On July 14, 2022, YM purportedly received an initial examination at CIMA Miami Springs. To the extent that the examination was performed in the first instance, the examining practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the examining practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, the examining practitioner – at the direction of the CIMA Miami Springs Defendants – provided YM with a false list of objectively unverifiable soft tissue injury "diagnoses", and then Casta falsely diagnosed YM with a purported "emergency medical condition". Furthermore, neither YM's presenting problems nor the treatment plan provided to YM by the CIMA Miami Springs Defendants presented any risk of significant complications, morbidity, or mortality. To the contrary, YM did not need any significant treatment at all as a result of the accident, and the treatment plan provided by the CIMA Miami Springs Defendants consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to YM. Even so, the CIMA Miami Springs Defendants billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the examination entailed some legitimate, moderate complexity medical decision-making.

(ix)  On July 15, 2022, an insured named JC was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to JC's vehicle, that there was minor damage to the other vehicle, and that JC's vehicle was drivable following the accident. The police report further indicated that JC was not injured and that JC did not complain of any pain at the scene. In keeping with the fact that JC was not seriously injured, JC did not visit any hospital emergency room following the accident. To the extent that JC experienced any health problems at all as a result of the accident, they were of minimal severity, and did not constitute any kind of "emergency medical condition". On July 29, 2022, JC purportedly received an initial examination at CIMA. To the extent that the examination was performed in the first instance, the examining practitioner did not retrieve, review, or analyze

any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the examining practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, the examining practitioner – at the direction of the CIMA Defendants – provided JC with a false list of objectively unverifiable soft tissue injury "diagnoses", and then Casta falsely diagnosed JC with a purported "emergency medical condition". Furthermore, neither JC's presenting problems nor the treatment plan provided to JC by the CIMA Defendants presented any risk of significant complications, morbidity, or mortality. To the contrary, JC did not need any significant treatment at all as a result of the accident, and the treatment plan provided by the CIMA Defendants consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to JC. Even so, the CIMA Defendants billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the examination entailed some legitimate, moderate complexity medical decision-making.

(x)     On August 19, 2022, an insured named SP was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to SP's vehicle, that there was minor damage to the other vehicle, and that SP's vehicle was drivable following the accident. The police report further indicated that SP was not injured and that SP did not complain of any pain at the scene. In keeping with the fact that SP was not seriously injured, SP did not visit any hospital emergency room following the accident. To the extent that SP experienced any health problems at all as a result of the accident, they were of minimal severity, and did not constitute any kind of "emergency medical condition". On September 24, 2022, SP purportedly received an initial examination at CIMA Miami Springs. To the extent that the examination was performed in the first instance, the examining practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the examining practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, the examining practitioner – at the direction of the CIMA Miami Springs Defendants – provided SP with a false list of objectively unverifiable soft tissue injury "diagnoses", and then Casta falsely diagnosed SP with a purported "emergency medical condition". Furthermore, neither SP's presenting problems nor the treatment plan provided to SP by the CIMA Miami Springs Defendants presented any risk of significant complications, morbidity, or mortality. To the contrary, SP did not need any significant treatment at all as a result of the accident, and the treatment plan provided by the CIMA Miami Springs Defendants consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to SP. Even so, the CIMA Miami Springs Defendants billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the examination entailed some legitimate, moderate complexity medical decision-making.

(xi)    On August 22, 2022, an insured named CA was involved in an automobile accident.

The contemporaneous police report indicated that there was minor damage to CA's vehicle, that there was minor damage to the other vehicle, and that CA's vehicle was drivable following the accident. The police report further indicated that CA was not injured and that CA did not complain of any pain at the scene. In keeping with the fact that CA was not seriously injured, CA did not visit any hospital emergency room following the accident. To the extent that CA experienced any health problems at all as a result of the accident, they were of minimal severity, and did not constitute any kind of "emergency medical condition". On September 15, 2022, CA purportedly received an initial examination at CIMA Miami Springs. To the extent that the examination was performed in the first instance, the examining practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the examining practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, the examining practitioner – at the direction of the CIMA Miami Springs Defendants – provided CA with a false list of objectively unverifiable soft tissue injury "diagnoses", and then Casta falsely diagnosed CA with a purported "emergency medical condition". Furthermore, neither CA's presenting problems nor the treatment plan provided to CA by the CIMA Miami Springs Defendants presented any risk of significant complications, morbidity, or mortality. To the contrary, CA did not need any significant treatment at all as a result of the accident, and the treatment plan provided by the CIMA Miami Springs Defendants consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to CA. Even so, the CIMA Miami Springs Defendants billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the examination entailed some legitimate, moderate complexity medical decision-making.

(xii)   On August 31, 2022, an insured named RC was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to RC's vehicle, that there was minor damage to the other vehicle, and that RC's vehicle was drivable following the accident. The police report further indicated that RC was not injured and that RC did not complain of any pain at the scene. In keeping with the fact that RC was not seriously injured, RC did not visit any hospital emergency room following the accident. To the extent that RC experienced any health problems at all as a result of the accident, they were of minimal severity, and did not constitute any kind of "emergency medical condition". On September 29, 2022, RC purportedly received an initial examination at CIMA Miami Springs. To the extent that the examination was performed in the first instance, the examining practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the examining practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, the examining practitioner – at the direction of the CIMA Miami Springs Defendants – provided RC with a false list of objectively unverifiable soft tissue injury "diagnoses", and then Casta falsely diagnosed RC with a purported "emergency

medical condition". Furthermore, neither RC's presenting problems nor the treatment plan provided to RC by the CIMA Miami Springs Defendants presented any risk of significant complications, morbidity, or mortality. To the contrary, RC did not need any significant treatment at all as a result of the accident, and the treatment plan provided by the CIMA Miami Springs Defendants consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to RC. Even so, the CIMA Miami Springs Defendants billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the examination entailed some legitimate, moderate complexity medical decision-making.

(xiii)   On August 31, 2022, an insured named AS was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to AS's vehicle, that there was minor damage to the other vehicle, and that AS's vehicle was drivable following the accident. The police report further indicated that AS was not injured and that AS did not complain of any pain at the scene. In keeping with the fact that AS was not seriously injured, AS did not visit any hospital emergency room following the accident. To the extent that AS experienced any health problems at all as a result of the accident, they were of minimal severity, and did not constitute any kind of "emergency medical condition". On September 16, 2022, AS purportedly received an initial examination at CIMA Miami Springs. To the extent that the examination was performed in the first instance, the examining practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the examining practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, the examining practitioner – at the direction of the CIMA Miami Springs Defendants – provided AS with a false list of objectively unverifiable soft tissue injury "diagnoses", and then Casta falsely diagnosed AS with a purported "emergency medical condition". Furthermore, neither AS's presenting problems nor the treatment plan provided to AS by the CIMA Miami Springs Defendants presented any risk of significant complications, morbidity, or mortality. To the contrary, AS did not need any significant treatment at all as a result of the accident, and the treatment plan provided by the CIMA Miami Springs Defendants consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to AS. Even so, the CIMA Miami Springs Defendants billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the examination entailed some legitimate, moderate complexity medical decision-making.

(xiv)   On September 20, 2022, an insured named CD was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to CD's vehicle, that there was minor damage to the other vehicle, and that CD's vehicle was drivable following the accident. The police report further indicated that CD was not injured and that CD did not complain of any pain at the scene. In keeping with the fact that CD was not seriously injured, CD did not visit

any hospital emergency room following the accident. To the extent that CD experienced any health problems at all as a result of the accident, they were of minimal severity, and did not constitute any kind of "emergency medical condition". On September 21, 2022, CD purportedly received an initial examination at Castellon. To the extent that the examination was performed in the first instance, the examining practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the examining practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, the examining practitioner – at the direction of the Castellon Defendants – provided CD with a false list of objectively unverifiable soft tissue injury "diagnoses", and then an advanced practice registered nurse named Luis Enrique Brossard Gonzalez, A.P.R.N. falsely diagnosed CD with a purported "emergency medical condition". Furthermore, neither CD's presenting problems nor the treatment plan provided to CD by the Castellon Defendants presented any risk of significant complications, morbidity, or mortality. To the contrary, CD did not need any significant treatment at all as a result of the accident, and the treatment plan provided by the Castellon Defendants consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to CD. Even so, the Castellon Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the examination entailed some legitimate, low complexity medical decision-making.

(xv)     On October 23, 2022, an insured named MC was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to MC's vehicle, that there was minor damage to the other vehicle, and that MC's vehicle was drivable following the accident. The police report further indicated that MC was not injured and that MC did not complain of any pain at the scene. In keeping with the fact that MC was not seriously injured, MC did not visit any hospital emergency room following the accident. To the extent that MC experienced any health problems at all as a result of the accident, they were of minimal severity, and did not constitute any kind of "emergency medical condition". On November 23, 2022, MC purportedly received an initial examination at CIMA. To the extent that the examination was performed in the first instance, the examining practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the examining practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, the examining practitioner – at the direction of the CIMA Defendants – provided MC with a false list of objectively unverifiable soft tissue injury "diagnoses", and then Casta falsely diagnosed MC with a purported "emergency medical condition". Furthermore, neither MC's presenting problems nor the treatment plan provided to MC by the CIMA Defendants presented any risk of significant complications, morbidity, or mortality. To the contrary, MC did not need any significant treatment at all as a result of the accident, and the treatment plan provided by the CIMA Defendants consisted of medically unnecessary

physical therapy services, which did not pose the least bit of risk to MC. Even so, the CIMA Defendants billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the examination entailed some legitimate, moderate complexity medical decision-making.

(xvi)   On February 26, 2023, an insured named VG was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to VG's vehicle and that VG's vehicle was drivable following the accident. The police report further indicated that VG was not injured and that VG did not complain of any pain at the scene. In keeping with the fact that VG was not seriously injured, VG did not visit any hospital emergency room following the accident. To the extent that VG experienced any health problems at all as a result of the accident, they were of minimal severity, and did not constitute any kind of "emergency medical condition". On March 3, 2023, VG purportedly received an initial examination at CIMA. To the extent that the examination was performed in the first instance, the examining practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the examining practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, the examining practitioner – at the direction of the CIMA Defendants – provided VG with a false list of objectively unverifiable soft tissue injury "diagnoses", and then Casta falsely diagnosed VG with a purported "emergency medical condition". Furthermore, neither VG's presenting problems nor the treatment plan provided to VG by the CIMA Defendants presented any risk of significant complications, morbidity, or mortality. To the contrary, VG did not need any significant treatment at all as a result of the accident, and the treatment plan provided by the CIMA Defendants consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to VG. Even so, the CIMA Defendants billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the examination entailed some legitimate, moderate complexity medical decision-making.

(xvii)   On March 9, 2023, an insured named BD was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to BD's vehicle, that there was minor damage to the other vehicle, and that BD's vehicle was drivable following the accident. The police report further indicated that BD was not injured and that BD did not complain of any pain at the scene. In keeping with the fact that BD was not seriously injured, BD did not visit any hospital emergency room following the accident. To the extent that BD experienced any health problems at all as a result of the accident, they were of minimal severity, and did not constitute any kind of "emergency medical condition". On March 28, 2023, BD purportedly received an initial examination at CIMA. To the extent that the examination was performed in the first instance, the examining practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the examining practitioner did not consider any significant number of diagnoses or

management options in connection with the examination. Instead, the examining practitioner – at the direction of the CIMA Defendants – provided BD with a false list of objectively unverifiable soft tissue injury "diagnoses", and then Casta falsely diagnosed BD with a purported "emergency medical condition". Furthermore, neither BD's presenting problems nor the treatment plan provided to BD by the CIMA Defendants presented any risk of significant complications, morbidity, or mortality. To the contrary, BD did not need any significant treatment at all as a result of the accident, and the treatment plan provided by the CIMA Defendants consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to BD. Even so, the CIMA Defendants billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the examination entailed some legitimate, moderate complexity medical decision-making.

(xviii) On September 6, 2023, an insured named CC was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to CC's vehicle and that CC's vehicle was drivable following the accident. The police report further indicated that CC was not injured and that CC did not complain of any pain at the scene. In keeping with the fact that CC was not seriously injured, CC did not visit any hospital emergency room following the accident. To the extent that CC experienced any health problems at all as a result of the accident, they were of minimal severity, and did not constitute any kind of "emergency medical condition". On September 25, 2023, CC purportedly received an initial examination at CIMA Miami Springs. To the extent that the examination was performed in the first instance, the examining practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the examining practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, the examining practitioner – at the direction of the CIMA Miami Springs Defendants – provided CC with a false list of objectively unverifiable soft tissue injury "diagnoses", and then CC was falsely diagnosed with a purported "emergency medical condition". Furthermore, neither CC's presenting problems nor the treatment plan provided to CC by the CIMA Miami Springs Defendants presented any risk of significant complications, morbidity, or mortality. To the contrary, CC did not need any significant treatment at all as a result of the accident, and the treatment plan provided by the CIMA Miami Springs Defendants consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to CC. Even so, the CIMA Miami Springs Defendants billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the examination entailed some legitimate, moderate complexity medical decision-making.

(xix) On October 6, 2023, an insured named OG was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to OG's vehicle, that there was minor damage to the other vehicle, and that OG's vehicle was drivable following the accident. The police report further indicated that OG

was not injured and that OG did not complain of any pain at the scene. In keeping with the fact that OG was not seriously injured, OG did not visit any hospital emergency room following the accident. To the extent that OG experienced any health problems at all as a result of the accident, they were of minimal severity, and did not constitute any kind of "emergency medical condition". On October 19, 2023, OG purportedly received an initial examination at CIMA. To the extent that the examination was performed in the first instance, the examining practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the examining practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, the examining practitioner – at the direction of the CIMA Defendants – provided OG with a false list of objectively unverifiable soft tissue injury "diagnoses", and then an advanced practice registered nurse named Larisa Perez Isasi, A.P.R.N. falsely diagnosed OG with a purported "emergency medical condition". Furthermore, neither OG's presenting problems nor the treatment plan provided to OG by the CIMA Defendants presented any risk of significant complications, morbidity, or mortality. To the contrary, OG did not need any significant treatment at all as a result of the accident, and the treatment plan provided by the CIMA Defendants consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to OG. Even so, the CIMA Defendants billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the examination entailed some legitimate, moderate complexity medical decision-making.

(xx)     On February 5, 2024, an insured named RM was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to RM's vehicle, that there was minor damage to the other vehicle, and that RM's vehicle was drivable following the accident. The police report further indicated that RM was not injured and that RM did not complain of any pain at the scene. In keeping with the fact that RM was not seriously injured, RM did not visit any hospital emergency room following the accident. To the extent that RM experienced any health problems at all as a result of the accident, they were of minimal severity, and did not constitute any kind of "emergency medical condition". On February 15, 2024, RM purportedly received an initial examination at Castellon. To the extent that the examination was performed in the first instance, the examining practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the examining practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, the examining practitioner – at the direction of the Castellon Defendants – provided RM with a false list of objectively unverifiable soft tissue injury "diagnoses", and then an advanced practice registered nurse named Yenia Torres, A.P.R.N. falsely diagnosed RM with a purported "emergency medical condition". Furthermore, neither RM's presenting problems nor the treatment plan provided to RM by the Castellon Defendants presented any risk of significant

complications, morbidity, or mortality. To the contrary, RM did not need any significant treatment at all as a result of the accident, and the treatment plan provided by the Castellon Defendants consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to RM. Even so, the Castellon Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the examination entailed some legitimate, low complexity medical decision-making.

135.   These are only representative examples. In the claims for initial examinations identified in Exhibits "1" - "3", the Examination Defendants routinely and falsely represented that the examinations involved legitimate low complexity medical decision-making or moderate complexity medical decision-making, when, in fact, they did not.

136.   There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

137.   An individual's age, height, weight, general physical condition, location within the vehicle, and location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

138.   As set forth above, in the claims identified in Exhibits "1" - "3", virtually all of the insureds whom the Examination Defendants purported to treat were involved in relatively minor accidents.

139.   It is improbable that any two or more insureds involved in any one of the minor automobile accidents in the claims identified in Exhibits "1" - "3" would suffer substantially similar injuries as the result of their accidents, or require a substantially similar course of treatment.

140.   It is even more improbable – to the point of impossibility – that this kind of pattern would recur with great frequency within the cohort of patients treating at CIMA, CIMA Miami Springs, and Castellon, with numerous instances in which two or more patients who had been involved in the same accident supposedly presented with substantially similar symptoms

warranting substantially similar diagnoses and treatment.

141.    Even so, in keeping with the fact that the Examination Defendants' putative "diagnoses" were pre-determined and false, and in keeping with the fact that their putative initial examinations involved no actual medical decision-making at all, the examining practitioners at CIMA, CIMA Miami Springs, and Castellon – at the direction of the Examination Defendants – frequently issued substantially similar, false "diagnoses", on or around the same date, to more than one insured involved in a single accident, and recommended a substantially similar course of medically unnecessary treatment to the insureds, despite the fact that each of the insureds was differently situated.

142.    For example:

(i)     On June 16, 2019, three insureds – NR, AC, and AC – were involved in the same automobile accident. Thereafter – incredibly – all three insureds presented at CIMA for initial examinations on the exact same date, June 20, 2019. NR, AC, and AC: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that NR, AC, and AC suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the CIMA Defendants provided NR, AC, and AC with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to all three of them.

(ii)    On October 31, 2019, three insureds – LC, RT, and NS – were involved in the same automobile accident. Thereafter – incredibly – all three insureds presented at CIMA for initial examinations on the exact same date, November 5, 2019. LC, RT, and NS: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that LC, RT, and NS suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the CIMA Defendants provided LC, RT, and NS with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to all three of them.

(iii)   On December 18, 2020, three insureds – RN, JM, and EP – were involved in the same automobile accident. Thereafter – incredibly – all three insureds presented at CIMA for initial examinations on the exact same date, December 22, 2020. RN,

JM, and EP: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that RN, JM, and EP suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the CIMA Defendants provided RN, JM, and EP with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to all three of them.

(iv)     On January 3, 2021, two insureds – JH and JB – were involved in the same automobile accident. Thereafter – incredibly – both insureds presented at Castellon for initial examinations on consecutive dates, January 5, 2021, and January 6, 2021. JH and JB: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that JH and JB suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Castellon Defendants provided JH and JB with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to both of them.

(v)      On August 16, 2021, three insureds – EV, PM, and EC – were involved in the same automobile accident. Thereafter – incredibly – all three insureds presented at CIMA for initial examinations on consecutive dates, August 24, 2021, and August 25, 2021. EV, PM, and EC: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that EV, PM, and EC suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the CIMA Defendants provided EV, PM, and EC with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to all three of them.

(vi)     On November 20, 2021, three insureds – PC, MR, and ML – were involved in the same automobile accident. Thereafter – incredibly – all three insureds presented at CIMA for initial examinations on the exact same date, December 15, 2021. PC, MR, and ML: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that PC, MR, and ML suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the CIMA Defendants provided PC, MR, and ML with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to all three of them.

(vii)    On July 11, 2022, two insureds – SM and YM – were involved in the same automobile accident. Thereafter – incredibly – both insureds presented at CIMA

Miami Springs for initial examinations on the exact same date, July 14, 2022. SM and YM: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that SM and YM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the CIMA Miami Springs Defendants provided SM and YM with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to both of them.

(viii)   On July 27, 2022, two insureds – TR and FH – were involved in the same automobile accident. Thereafter – incredibly – both insureds presented at CIMA Miami Springs for initial examinations on the exact same date, September 15, 2022. TR and FH: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that TR and FH suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the CIMA Miami Springs Defendants provided TR and FH with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to both of them.

(ix)   On August 22, 2022, three insureds – AA, RO, and ER – were involved in the same automobile accident. Thereafter – incredibly – all three insureds presented at CIMA Miami Springs for initial examinations on consecutive dates, September 28, 2022, and September 29, 2022. AA, RO, and ER: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that AA, RO, and ER suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the CIMA Miami Springs Defendants provided AA, RO, and ER with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to all three of them.

(x)   On September 3, 2022, three insureds – EA, JG and BG – were involved in the same automobile accident. Thereafter – incredibly – all three insureds presented at CIMA Miami Springs for initial examinations on the exact same date, September 29, 2022. EA, JG and BG: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that EA, JG and BG suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the CIMA Miami Springs Defendants provided EA, JG and BG with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to all three of them.

(xi)     On September 24, 2022, three insureds – EP, MC, and KC – were involved in the same automobile accident. Thereafter – incredibly – all three insureds presented at CIMA for initial examinations on consecutive dates, October 24, 2022, and October 25, 2022. EP, MC, and KC: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that EP, MC, and KC suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the CIMA Defendants provided EP, MC, and KC with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to all three of them.

(xii)    On December 27, 2022, two insureds – HA and OG – were involved in the same automobile accident. Thereafter – incredibly – both insureds presented at Castellon for initial examinations on the exact same date, December 29, 2022. HA and OG: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that HA and OG suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Castellon Defendants provided HA and OG with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xiii)   On January 12, 2023, two insureds – WR and TD – were involved in the same automobile accident. Thereafter – incredibly – both insureds presented at CIMA Miami Springs for initial examinations on the exact same date, January 19, 2023. WR and TD: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that WR and TD suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the CIMA Miami Springs Defendants provided WR and TD with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xiv)    On January 13, 2023, two insureds – EE and AE – were involved in the same automobile accident. Thereafter – incredibly – both insureds presented at CIMA Miami Springs for initial examinations on the exact same date, January 17, 2023. EE and AE: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that EE and AE suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the CIMA Miami Springs Defendants provided EE and AE with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xv)   On February 4, 2023, three insureds – SC, OC, and AC – were involved in the same automobile accident. Thereafter – incredibly – all three insureds presented at CIMA for initial examinations on the exact same date, February 11, 2023. SC, OC, and AC: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that SC, OC, and AC suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the CIMA Defendants provided SC, OC, and AC with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to all three of them.

(xvi)   On February 25, 2023, two insureds – NC and OR – were involved in the same automobile accident. Thereafter – incredibly – both insureds presented at Castellon for initial examinations on the exact same date, February 28, 2023. NC and OR: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that NC and OR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Castellon Defendants provided NC and OR with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xvii)   On May 10, 2023, four insureds – JB, LB, SB, and AM – were involved in the same automobile accident. Thereafter – incredibly – all four insureds presented at CIMA for initial examinations on consecutive dates – June 15, 2023, and June 16, 2023. JB, LB, SB, and AM: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that JB, LB, SB, and AM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the CIMA Defendants provided JB, LB, SB, and AM with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to all four of them.

(xviii)   On August 28, 2023, two insureds – DH and DH – were involved in the same automobile accident. Thereafter – incredibly – both insureds presented at CIMA Miami Springs for initial examinations on the exact same date, September 8, 2023. DH and DH: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that DH and DH suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the CIMA Miami Springs Defendants provided DH and DH with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary

treatment to both of them.

(xix)   On December 11, 2023, two insureds – RH and JC – were involved in the same automobile accident. Thereafter – incredibly – both insureds presented at Castellon for initial examinations on the exact same date, December 13, 2023. RH and JC: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that RH and JC suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Castellon Defendants provided RH and JC with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xx)   On February 5, 2024, two insureds – RM and RL – were involved in the same automobile accident. Thereafter – incredibly – both insureds presented at Castellon for initial examinations on the exact same date, February 15, 2024. RM and RL: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that RM and RL suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Castellon Defendants provided RM and RL with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to both of them.

143.   These are only representative examples. In the claims for initial examinations that are identified in Exhibits "1" - "3", the Examination Defendants frequently issued substantially similar "diagnoses" – on or around the same date – to more than one insured involved in a single accident, and recommended a substantially similar course of medically unnecessary "treatment" to the insureds, despite the fact that each of the insureds was differently situated and, in any case, did not require the treatment.

144.   The Examination Defendants routinely caused these false "diagnoses" to be inserted into their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that the Defendants purported to provide to the insureds.

145.    In the claims for initial examinations identified in Exhibits "1" - "3", the Examination Defendants routinely and falsely represented that the putative initial examinations involved legitimate low complexity medical decision-making and legitimate moderate complexity medical decision-making, in order to create a false basis to bill for the initial examinations under CPT codes 99203 and 99204. This is because examinations billable under CPT codes 99203 and 99204 are reimbursable at higher rates than examinations that do not require any complex medical decision-making at all.

146.    In this context, Abraham, who – at all relevant times – purported to serve as medical director at CIMA, did not legitimately perform the required duties of a clinic medical director at CIMA.

147.    Had Abraham legitimately conducted systematic reviews of CIMA's billings, he would have noted – among other things – that CIMA's billings routinely and fraudulently misrepresented the nature, extent, and results of the purported initial examinations at CIMA.

148.    Similarly, in this context, Casta, who – at all relevant times – purported to serve as medical director at CIMA Miami Springs and Castellon, did not legitimately perform the required duties of a clinic medical director at CIMA Miami Springs and Castellon.

149.    Had Casta legitimately conducted systematic reviews of CIMA Miami Springs and Castellon's respective billings, she would have noted – among other things – that CIMA Miami Springs and Castellon's billings routinely and fraudulently misrepresented the nature, extent, and results of the purported initial examinations at CIMA Miami Springs and Castellon.

150.    In the claims for initial examinations identified in Exhibits "1" - "3", the Examination Defendants routinely and fraudulently misrepresented that the initial examinations were lawfully provided and eligible for PIP reimbursement, when, in fact, the initial examinations

were neither lawfully provided nor reimbursable, because:

(i)      the putative initial examinations were illusory, with outcomes that were pre-determined to result in substantially identical, false "diagnoses" and treatment recommendations, regardless of the insureds' true individual circumstances and presentation;

(ii)     the charges for the putative initial examinations misrepresented the nature, extent, and results of the examinations; and

(iii)    CIMA, CIMA Miami Springs, and Castellon were never eligible to collect PIP Benefits in connection with the putative initial examinations in the first instance, inasmuch as each of the clinics operated in pervasive violation of Florida law.

**C.      The Defendants' Fraudulent and Unlawful Claims for "Physical Therapy" Services**

151.    In addition to the fraudulent initial examinations, the Defendants virtually always purported to subject the insureds in the claims identified in Exhibits "1" - "4" to months of medically unnecessary "physical therapy" treatment, which the Defendants then fraudulently and unlawfully billed to GEICO.

152.    As set forth in Exhibit "1", the CIMA Defendants billed the "physical therapy" services to GEICO under:

(i)      CPT code 97010, for purported hot/cold pack treatment, typically resulting in a charge of $15.00 for each modality they purported to provide.

(ii)     CPT code 97012, for purported mechanical traction, typically resulting in a charge of $50.00 or $75.00 for each modality they purported to provide.

(iii)    CPT code 97032, for purported electrical stimulation, typically resulting in a charge of $45.00 for each modality they purported to provide.

(iv)     CPT code 97035, for purported ultrasound treatment, typically resulting in a charge of $45.00 for each modality they purported to provide.

(v)      CPT code 97110, for purported therapeutic exercises, typically resulting in a charge of $75.00 for each modality they purported to provide.

(vi)     CPT code 97112, for purported therapeutic neuromuscular reeducation, typically resulting in a charge of $75.00 or $80.00 for each modality they purported to provide.

(vii)    CPT code 97116, for purported therapeutic gait training with stairs, typically resulting in a charge of $75.00 for each modality they purported to provide.

(viii)   CPT code 97140, for purported manual therapy, typically resulting in a charge of $75.00 for each modality they purported to provide.

(ix)    CPT code 97150, for purported therapeutic group procedures, typically resulting in a charge of $75.00 for each modality they purported to provide.

(x)     CPT code 97162, for purported physical therapy evaluations, typically resulting in a charge of $200.00 or $250.00 for each modality they purported to provide.

(xi)    CPT code 97163, for purported physical therapy evaluations, typically resulting in a charge of $250.00 for each modality they purported to provide.

(xii)   CPT code 97164, for purported physical therapy re-evaluations, typically resulting in a charge of $200.00 or $250.00 for each modality they purported to provide.

(xiii)  CPT code 97530, for purported therapeutic activities, typically resulting in a charge of $75.00, $85.00, or $90.00 for each modality they purported to provide.

(xiv)   CPT code 97533, for purported sensory integration therapy, typically resulting in a charge of $75.00 for each modality they purported to provide.

(xv)    CPT code 97535, for purported self-care/home management training, typically resulting in a charge of $75.00 for each modality they purported to provide.

(xvi)   Health care Common Procedure Coding System ("HCPCS") code G0283, for purported electrical stimulation, typically resulting in a charge of $30.00 for each modality they purported to provide.

153.    As set forth in Exhibit "2", the CIMA Miami Springs Defendants billed the "physical therapy" services to GEICO under:

(i)     CPT code 97010, for purported hot/cold pack treatment, typically resulting in a charge of $15.00 for each modality they purported to provide.

(ii)    CPT code 97035, for purported ultrasound treatment, typically resulting in a charge of $45.00 for each modality they purported to provide.

(iii)   CPT code 97110, for purported therapeutic exercises, typically resulting in a charge of $75.00 for each modality they purported to provide.

(iv)    CPT code 97112, for purported therapeutic neuromuscular reeducation, typically

resulting in a charge of $80.00 for each modality they purported to provide.

(v)     CPT code 97140, for purported manual therapy, typically resulting in a charge of $75.00 for each modality they purported to provide.

(vi)    CPT code 97163, for purported physical therapy evaluations, typically resulting in a charge of $250.00 for each modality they purported to provide.

(vii)   CPT code 97164, for purported physical therapy re-evaluations, typically resulting in a charge of $200.00 for each modality they purported to provide.

(viii)  CPT code 97530, for purported therapeutic activities, typically resulting in a charge of $90.00 for each modality they purported to provide.

(ix)    CPT code 97535, for purported self-care/home management training, typically resulting in a charge of $75.00 for each modality they purported to provide.

(x)     HCPCS code G0283, for purported electrical stimulation, typically resulting in a charge of $45.00 for each modality they purported to provide.

154.    As set forth in Exhibit "3", the Castellon Defendants billed the "physical therapy" services under:

(i)     CPT code 97010, for purported hot/cold pack treatment, typically resulting in a charge of $15.00 for each modality they purported to provide.

(ii)    CPT code 97012, for purported mechanical traction, typically resulting in a charge of $40.00 for each modality they purported to provide.

(iii)   CPT code 97026, for purported infrared treatment, typically resulting in a charge of $25.00 for each modality they purported to provide.

(iv)    CPT code 97032, for purported electrical stimulation, typically resulting in a charge of $40.00 for each modality they purported to provide.

(v)     CPT code 97035, for purported ultrasound treatment, typically resulting in a charge of $40.00 for each modality they purported to provide.

(vi)    CPT code 97110, for purported therapeutic exercises, typically resulting in a charge of $70.00 for each modality they purported to provide.

(vii)   CPT code 97112, for purported therapeutic neuromuscular reeducation, typically resulting in a charge of $80.00 for each modality they purported to provide.

(viii)  CPT code 97530, for purported therapeutic activities, typically resulting in a charge

of $40.00, $45.00, or $70.00 for each modality they purported to provide.

(ix)     CPT code 97535, for purported self-care/home management training, typically resulting in a charge of $45.00 for each modality they purported to provide.

(x)      HCPCS code S8948, for purported low-level laser therapy, typically resulting in a charge of $200.00, $250.00, or $300.00 for each modality they purported to provide.

155.     As set forth in Exhibit "4", Community Choice, Casta, and Garcia Prada (collectively the "Community Choice Defendants") billed the "physical therapy" services under:

(i)      CPT code 97010, for purported hot/cold pack treatment, typically resulting in a charge of $15.00 for each modality they purported to provide.

(ii)     CPT code 97012, for purported mechanical traction, typically resulting in a charge of $45.00 for each modality they purported to provide.

(iii)    CPT code 97014, for purported electrical stimulation, typically resulting in a charge of $30.00 for each modality they purported to provide.

(iv)     CPT code 97026, for purported infrared treatment, typically resulting in a charge of $27.00 or $30.00 for each modality they purported to provide.

(v)      CPT code 97032, for purported electrical stimulation, typically resulting in a charge of $40.00 for each modality they purported to provide.

(vi)     CPT code 97035, for purported ultrasound treatment, typically resulting in a charge of $35.00 for each modality they purported to provide.

(vii)    CPT code 97110, for purported therapeutic exercises, typically resulting in a charge of $70.00 for each modality they purported to provide.

(viii)   CPT code 97112, for purported therapeutic neuromuscular reeducation, typically resulting in a charge of $75.00 for each modality they purported to provide.

(ix)     CPT code 97116, for purported therapeutic gait training with stairs, typically resulting in a charge of $65.00 for each modality they purported to provide.

(x)      CPT code 97139, for purported unlisted therapeutic procedures, typically resulting in a charge of $40.00 for each modality they purported to provide.

(xi)     CPT code 97140, for purported manual therapy, typically resulting in a charge of $70.00 for each modality they purported to provide.

(xii)  CPT code 97163, for purported physical therapy evaluations, typically resulting in a charge of $300.00 for each modality they purported to provide.

(xiii)  CPT code 97530, for purported therapeutic activities, typically resulting in a charge of $80.00 for each modality they purported to provide.

(xiv)  CPT code 97535, for purported self-care/home management training, typically resulting in a charge of $75.00 for each modality they purported to provide.

156.    In the claims identified in Exhibits "1" - "4", the charges for the purported "physical therapy" services were fraudulent and unlawful in that they misrepresented the Clinic Defendants' eligibility to collect PIP Benefits in the first instance.

157.    In fact, and as set forth herein, the Clinic Defendants were never eligible to collect PIP Benefits, inasmuch as CIMA, CIMA Miami Springs, Castellon, and Community Choice operated in pervasive violation of Florida law.

158.    In the claims identified in Exhibits "1" - "4", the charges for the purported "physical therapy" services also were fraudulent, unlawful, and ineligible for PIP reimbursement because the services were performed – to the extent that they were performed at all – by unlicensed and unsupervised individuals, and by massage therapists, none of whom was licensed to practice physical therapy.

159.    The Defendants were aware of the fact that they could not legally recover PIP Benefits for services performed by massage therapists and unlicensed/unsupervised individuals.

160.    As a result, and in order to conceal the fact that massage therapists and unlicensed/unsupervised individuals performed the purported "physical therapy" services that were unlawfully billed to GEICO through the respective Clinic Defendants, the Defendants omitted any reference to the massage therapists and unlicensed/unsupervised individuals associated with the Clinic Defendants on the HCFA-1500 forms that they used to bill for the putative "physical therapy" services.

161.    Instead, in the claims for "physical therapy" services identified in Exhibits "1" - "4", the Defendants routinely and falsely listed Casta in Box 31 of the HCFA-1500 forms as the supposed provider or direct supervisor of the purported "physical therapy" services.

162.    In fact, Casta – who was simultaneously purporting to perform or directly supervise an impossible number of physical therapy and other services at numerous health care practices at numerous locations on individual dates – did not legitimately perform or directly supervise the "physical therapy" services in the claims identified in Exhibits "1" - "4", and could not have legitimately performed or directly supervised the "physical therapy" services.

163.    For example:

(i)     On January 28, 2020, Casta purported to personally perform, or at least directly supervise: (a) at least 6 hours of physical therapy and related services provided to three different GEICO insureds at Castellon; and (b) at least 16.25 hours of physical therapy and related services provided to six different GEICO insureds at a facility called New Generation Medical Center, Inc. ("New Generation"). In all, GEICO received billing for at least 22.25 hours of services that Casta purported to personally perform or directly supervise, at two different locations, on January 28, 2020.

(ii)    On November 4, 2021, Casta purported to personally perform, or at least directly supervise: (a) at least 2 hours of physical therapy and related services provided to a GEICO insured at Castellon; (b) at least 22.5 hours of physical therapy and related services provided to fourteen different GEICO insureds at CIMA; and (c) 4 hours of physical therapy and related services provided to two different GEICO insureds at New Generation. In all, GEICO received billing for at least 28.5 hours of services that Casta purported to personally perform or directly supervise, at three different locations, on November 4, 2021.

(iii)   On December 20, 2021, Casta purported to personally perform, or at least directly supervise: (a) at least 21 hours of physical therapy and related services provided to fourteen different GEICO insureds at CIMA; and (b) 5.25 hours of physical therapy and related services provided to three different GEICO insureds at New Generation. In all, GEICO received billing for at least 26.25 hours of services that Casta purported to personally perform or directly supervise, at two different locations, on December 20, 2021.

(iv)    On December 22, 2021, Casta purported to personally perform, or at least directly supervise: (a) at least 30.5 hours of physical therapy and related services provided

to 21 different GEICO insureds at CIMA; and (b) 5.25 hours of physical therapy and related services provided to three different GEICO insureds at New Generation. In all, GEICO received billing for at least 35.75 hours of services that Casta purported to personally perform or directly supervise, at two different locations, on December 22, 2021.

(v)     On April 6, 2022, Casta purported to personally perform, or at least directly supervise: (a) at least 10 hours of physical therapy and related services provided to five different GEICO insureds at Castellon; (b) at least 7.75 hours of physical therapy and related services provided to seven different GEICO insureds at CIMA; and (c) 10.75 hours of physical therapy and related services provided to five different GEICO insureds at New Generation. In all, GEICO received billing for at least 28.5 hours of services that Casta purported to personally perform or directly supervise, at three different locations, on April 6, 2022.

(vi)    On June 21, 2022, Casta purported to personally perform, or at least directly supervise: (a) at least 6.5 hours of physical therapy and related services provided to three different GEICO insureds at Castellon; (b) at least 14.25 hours of physical therapy and related services provided to twelve different GEICO insureds at CIMA; and (c) 7.75 hours of physical therapy and related services provided to four different GEICO insureds at New Generation. In all, GEICO received billing for at least 28.5 hours of services that Casta purported to personally perform or directly supervise, at three different locations, on June 21, 2022.

(vii)   On July 14, 2022, Casta purported to personally perform, or at least directly supervise: (a) at least 6 hours of physical therapy and related services provided to three different GEICO insureds at Castellon; (b) at least 14.75 hours of physical therapy and related services provided to twelve different GEICO insureds at CIMA; (c) 1 hour of physical therapy and related services provided to two different GEICO insureds at CIMA Miami Springs; and (d) 7 hours of physical therapy and related services provided to four different GEICO insureds at New Generation. In all, GEICO received billing for at least 28.75 hours of services that Casta purported to personally perform or directly supervise, at four different locations, on July 14, 2022.

(viii)  On October 26, 2022, Casta purported to personally perform, or at least directly supervise: (a) at least 2 hours of physical therapy and related services provided to a GEICO insured at Castellon; (b) at least 20 hours of physical therapy and related services provided to fifteen different GEICO insureds at CIMA; and (c) 12.5 hours of physical therapy and related services provided to six different GEICO insureds at New Generation. In all, GEICO received billing for at least 34.5 hours of services that Casta purported to personally perform or directly supervise, at three different locations, on October 26, 2022.

(ix)    On January 6, 2023, Casta purported to personally perform, or at least directly supervise: (a) at least 4 hours of physical therapy and related services provided to

two different GEICO insureds at Castellon; (b) at least 19.25 hours of physical therapy and related services – including 15 initial examinations billed under CPT code 99204 – provided to fourteen different GEICO insureds at CIMA; (c) 1 hour of physical therapy and related services – including 1 initial examination billed under CPT code 99204 – provided to a GEICO insured at CIMA Miami Springs; and (d) 3.5 hours of physical therapy and related services provided to two different GEICO insureds at New Generation. In all, GEICO received billing for at least 27.75 hours of services that Casta purported to personally perform or directly supervise, at four different locations, on January 6, 2023.

(x) On January 17, 2024, Casta purported to personally perform, or at least directly supervise: (a) at least 2 hours of physical therapy and related services provided to a GEICO insured at Castellon; (b) at least 8.75 hours of physical therapy and related services – including 6 initial examinations billed under CPT code 99204 – provided to six different GEICO insureds at CIMA; and (c) 9.25 hours of physical therapy and related services – including 5 follow-up examinations billed under CPT code 99211 – provided to three different GEICO insureds at Community Choice. In all, GEICO received billing for at least 20 hours of services that Casta purported to personally perform or directly supervise, at three different locations, on January 17, 2024.

164.    These are only representative examples. In the claims for Fraudulent Services identified in Exhibits "1" - "4", the Defendants routinely and falsely represented that Casta had performed – or at least directly supervised – an impossible amount of services on individual dates.

165.    Furthermore, upon information and belief, the fraudulent billing that the Defendants submitted to GEICO constituted only a fraction of the total fraudulent billing for Fraudulent Services that they submitted – or caused to be submitted – to all of the automobile insurers in the Florida automobile insurance market.

166.    GEICO is only one of the automobile insurance companies doing business in the Florida automobile insurance market.

167.    It is extremely improbable – to the point of impossibility – that the Defendants only submitted fraudulent billing to GEICO alone, and that the Defendants did not simultaneously bill other automobile insurers.

168.    Thus, upon information and belief, the impossible amount of Fraudulent Services

that Casta purported to perform or directly supervise for GEICO insureds, on individual dates of service – including but not limited to the dates of service identified above – constituted only a fraction of the total amount of Fraudulent Services that Casta purported to perform or directly supervise on those same dates of service.

169.    In keeping with the fact that the Defendants falsely represented that Casta had performed or directly supervised the services that they billed to GEICO, the respective Clinic Defendants' clinic licensing applications – which were submitted under the penalties of perjury – represented that Casta did not perform health care services at the Clinic Defendants at all.

170.    Even so, the Defendants billed GEICO for tens of thousands of purported health care services, and falsely represented in the billing that Casta had personally performed or directly supervised almost all of them.

171.    In the claims for "physical therapy" services identified in Exhibits "1" - "4", the Defendants routinely and falsely misrepresented that the "physical therapy" services were lawfully provided and reimbursable, when, in fact, they were neither lawfully provided nor reimbursable, because:

    (i)     the purported "physical therapy" services were performed – to the extent that they were performed at all – by massage therapists and unlicensed/unsupervised individuals, in contravention of Florida law;

    (ii)    the Defendants could not lawfully recover PIP Benefits for the purported "physical therapy" services, because the services were performed by massage therapists and unlicensed/unsupervised individuals; and

    (iii)   the Defendants systematically and fraudulently misrepresented and concealed the identities of the individuals who either personally performed or directly supervised the putative "physical therapy" services.

172.    Moreover, and in keeping with the fact that the "physical therapy" services in the claims identified in Exhibits "1" - "4" were unlawfully performed by massage therapists and

unlicensed/unsupervised individuals – without any legitimate supervision by Casta, Abraham, or any other physicians or physical therapists – the services were medically unnecessary and were provided, to the extent that they were provided at all, in a manner that did not comply with legitimate standards of care.

173. In a legitimate clinical setting, each individual patient's physical therapy treatment schedule, and the specific treatment modalities that will be used as a part of that treatment, must be tailored to the specific patient's circumstances, symptomatology, and presentation.

174. In a legitimate clinical setting, the nature of, extent of, and schedule for physical therapy is constantly adjusted for each individual patient based on each patient's treatment progress, as assessed on an ongoing basis as they receive the physical therapy.

175. In keeping with the fact that the purported "physical therapy" services that were billed to GEICO through the Clinic Defendants were not medically necessary, the Defendants did not tailor the "physical therapy" services that they purported to provide to each insured's individual circumstances and presentation.

176. There are many individual types of physical therapy services that potentially can be provided to a patient, depending on the patient's individual symptomatology and needs.

177. However, the Defendants purported to provide substantially similar physical therapy "treatments" to the insureds in the claims identified in Exhibits "1" - "4" – on substantially the same schedule – without regard for the insureds' individual circumstances.

178. In this context, Abraham – who, at all relevant times, purported to be the medical director at CIMA – did not, and could not have, legitimately performed his duties as medical director of CIMA.

179. Had Abraham actually performed his duties as medical director, he would have

noted – among other things – that the "physical therapy" services at CIMA were medically unnecessary, unlawfully provided by massage therapists and unlicensed/unsupervised individuals, and unlawfully billed to GEICO.

180.    Similarly, in this context, Casta – who, at all relevant times, purported to be the medical director at CIMA Miami Springs, Castellon, and Community Choice – did not, and could not have, legitimately performed her duties as medical director of those clinics.

181.    Had Casta actually performed her duties as medical director, she would have noted – among other things – that the "physical therapy" services at CIMA Miami Springs, Castellon, and Community Choice were medically unnecessary, unlawfully provided by massage therapists and unlicensed/unsupervised individuals, and unlawfully billed to GEICO.

**D.    The Fraudulent and Unlawful Charges for Pain Management Injections at CIMA**

182.    Based on the false, pre-determined results of their purported patient examinations, the CIMA Defendants routinely purported to subject the insureds in the claims identified in Exhibit "1" to medically unnecessary pain management injections, including platelet rich plasma injections, trigger point injections, spinal cord injections, and transforaminal epidural steroid injections, among others.

183.    The treating practitioners who worked at CIMA under the direction of the CIMA Defendants purported to perform the injections.

184.    As set forth in Exhibit "1", the CIMA Defendants billed GEICO for the pain management injections under:

   (i)    HCPCS code 0232T, for purported platelet rich plasma injections, typically resulting in a charge of $1,000.00 for each injection they purported to provide.

   (ii)   CPT code 20553, for purported trigger point injections of three or more muscle groups, typically resulting in a charge of $2,600.00 for each injection they purported to provide.

(iii)    CPT code 20610, for purported arthrocentesis, aspiration, and/or injections of major joints or bursas without ultrasound guidance, typically resulting in a charge of $1,750.00 for each modality they purported to provide.

(iv)    CPT code 20701, for purported removal of drug delivery systems, typically resulting in a charge of $575.00 for each modality they purported to provide.

(v)    CPT code 62323, for purported lumbar-sacral spine epidural steroid injections, typically resulting in a charge of $5,000.00 for each injection they purported to provide.

(vi)    CPT code 64479, for purported transforaminal epidural steroid injections ("TFESI") performed at the T12-L1 level of the spine, typically resulting in a charge of $5,200.00 for each injection they purported to provide.

(vii)    CPT code 64480, for purported epidural steroid injections performed at additional spinal levels in conjunction with other epidural spinal injections, typically resulting in a charge of $3,500.00 for each injection they purported to provide.

(viii)    CPT code 64483, for purported TFESI performed at a single spinal level with fluoroscopic or CT imaging guidance, typically resulting in a charge of $5,000.00 for each injection they purported to provide.

(ix)    CPT code 64484, for purported TFESI performed at additional spinal levels with fluoroscopic or CT imaging guidance, typically resulting in a charge of $3,000.00 for each injection they purported to provide.

(x)    CPT code 64493, for purported diagnostic or therapeutic injections into the paravertebral facet joints or surrounding nerves in the lumbar-sacral region with fluoroscopic or CT imaging guidance, typically resulting in a charge of $2,250.00 for each injection they purported to provide.

(xi)    CPT code 64494, for purported diagnostic or therapeutic injections into the paravertebral facet joints or surrounding nerves in the lumbar-sacral region with fluoroscopic or CT imaging guidance, typically resulting in a charge of $3,500.00 for each injection they purported to provide.

(xii)    CPT code 64495, for purported diagnostic or therapeutic injections into the paravertebral facet joints or surrounding nerves in the lumbar-sacral region with fluoroscopic or CT imaging guidance, typically resulting in a charge of $3,500.00 for each injection they purported to provide.

185.    As set forth below, the charges for the pain management injections were fraudulent, unlawful, and ineligible for PIP reimbursement because the pain management injections were

medically unnecessary and were provided – to the extent that they were provided at all – pursuant to the Defendants' pre-determined fraudulent treatment and billing protocols, and not to provide medically necessary treatment to the insureds who were subjected to the injections.

186.    Moreover, the charges for pain management injections were fraudulent in that they misrepresented the CIMA Defendants' eligibility to collect PIP Benefits in the first instance.

187.    In fact, and as set forth above, the CIMA Defendants were never eligible to collect PIP Benefits, inasmuch as CIMA operated in pervasive violation of Florida law.

188.    Generally, when a patient presents with a soft tissue injury such as a sprain or strain secondary to an automobile accident, the initial standard of care is conservative treatment comprised of rest, ice, compression, and – if applicable – elevation of the affected body part.

189.    If that sort of conservative treatment does not resolve the patient's symptoms, the standard of care can include other conservative treatment modalities such as chiropractic, physical therapy, and the use of over-the-counter pain management medication.

190.    The substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of weeks through this sort of conservative treatment, or even no treatment at all.

191.    In a legitimate clinical setting, pain management injections should not be administered until a patient has failed these conservative courses of treatment.

192.    This is because the substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of weeks through conservative treatment, or no treatment at all, and invasive interventional pain management procedures entail a degree of risk to the patient that is absent with more conservative forms of treatment.

193.    Additionally, in a legitimate clinical setting, pain management injections should

not be administered more than once every two months, and multiple varieties of pain management injections should not be administered simultaneously. This is because: (i) properly administered pain management injections should provide pain relief lasting for at least two months; (ii) a proper interval between pain management injections – as well as different types of pain management injections – is necessary to determine whether or not the preceding pain management injections were effective; and (iii) if a patient's pain is not relieved through the pain management injections, it is possible that the pain is being caused by something more serious than a soft tissue injury secondary to an automobile accident, and the perpetuating factors of the pain must be identified and managed.

194.    However, in the claims for pain management injections identified in Exhibit "1", the CIMA Defendants routinely purported to administer pain management injections to insureds before the insureds had even tried and failed any course of legitimate, conservative treatment.

195.    For example:

(i)     On December 3, 2020, an insured named BP was involved in an automobile accident. The CIMA Defendants purported to provide TFESI to BP under CPT codes 64483 and 64484 on January 19, 2021 – less than two months after the accident – even though BP could not have failed conservative treatment less than two months after the automobile accident.

(ii)    On January 21, 2021, an insured named SD was involved in an automobile accident. The CIMA Defendants purported to provide TFESI to SD under CPT code 64483 on March 10, 2021 – less than two months after the accident – even though SD could not have failed conservative treatment less than two months after the automobile accident.

(iii)   On April 13, 2021, an insured named JR was involved in an automobile accident. The CIMA Defendants purported to provide arthrocentesis and aspiration to JR under CPT code 20610 on June 10, 2021 – less than two months after the accident – even though JR could not have failed conservative treatment less than two months after the automobile accident.

(iv)    On April 30, 2021, an insured named IM was involved in an automobile accident. The CIMA Defendants purported to provide lumbar-sacral spine epidural steroid

injections to IM under CPT code 62323 on May 27, 2021 – less than one month after the accident – even though IM could not have failed conservative treatment less than one month after the automobile accident.

(v)     On May 1, 2021, an insured named JP was involved in an automobile accident. The CIMA Defendants purported to provide multiple diagnostic or therapeutic injections into the paravertebral facet joints or surrounding nerves in the lumbar-sacral region to JP under CPT codes 64493, 64494, and 64495 on July 1, 2021 – two months after the accident – even though JP could not have failed conservative treatment two months after the automobile accident.

196.    These are only representative examples. In the claims for pain management injections identified in Exhibit "1", the CIMA Defendants routinely purported to provide medically unnecessary pain management injections to insureds before the insureds tried and failed any course of legitimate, conservative treatment or could have developed symptoms that would warrant the administration of the pain management injections.

197.    The CIMA Defendants did this in order to maximize the charges that they could submit to GEICO, rather than to provide medically necessary treatment to the insureds who purportedly received and were subjected to the pain management injections.

198.    In this context, Abraham, who – at all relevant times – purported to serve as medical director at CIMA, did not legitimately perform the required duties of a clinic medical director at CIMA.

199.    Had Abraham legitimately conducted systematic reviews of CIMA's billings, he would have noted – among other things – that CIMA routinely billed for medically unwarranted injections in contravention of the pertinent standards of care.

E.      **The Fraudulent and Unlawful Charges for HME at CIMA and CIMA Miami Springs**

200.    As part of their fraudulent scheme, Casta, CIMA, Abraham, CIMA Miami Springs, Infante, and Cisneros (collectively the "HME Defendants") purported to provide many insureds with HME – and particularly, rigid lower back braces known as a lumbar-sacral orthoses ("LSO")

69

and cervical collars.

201.    As set forth in Exhibit "1", the CIMA Defendants billed GEICO for the HME

under:

(i)     HCPCS code L0180, for a purported adjustable cervical, multiple post collar with occipital/mandibular supports, typically resulting in a charge of $1,700.00 for each cervical collar they purported to provide.

(ii)    HCPCS code L0630, for a purported LSO with sagittal control, typically resulting in a charge of $2,100.00 for each LSO they purported to provide.

(iii)   HCPCS code L0631, for a purported LSO with sagittal control, typically resulting in a charge of $2,100.00 for each LSO they purported to provide.

(iv)    HCPCS code L0637, for a purported LSO with sagittal-coronal control, typically resulting in a charge of $2,100.00 for each LSO they purported to provide.

202.    As set forth in Exhibit "2", the CIMA Miami Springs Defendants billed GEICO for

the HME under:

(i)     HCPCS code L0180, for a purported adjustable cervical, multiple post collar with occipital/mandibular supports, typically resulting in a charge of $1,700.00 for each cervical collar they purported to provide.

(ii)    HCPCS code L0631, for a purported LSO with sagittal control, typically resulting in a charge of $2,100.00 for each LSO they purported to provide.

203.    Like the Defendants' charges for the other Fraudulent Services, the charges for the

HME were fraudulent in that they misrepresented the HME Defendants' eligibility to collect PIP

Benefits in the first instance.

204.    In fact, and as set forth herein, the HME Defendants were never eligible to collect

PIP Benefits, inasmuch as CIMA and CIMA Miami Springs operated in pervasive violation of

Florida law.

205.    Moreover, the HME Defendants' charges for the rigid LSOs identified in Exhibits

"1" - "2" were also fraudulent in that they misrepresented the medical necessity of the LSOs.

206.    A rigid LSO is a custom-fitted lower back brace designed to restrict the movement of a patient's torso and support the patient's lumbar spine. Because of its rigidity and required placement on a patient's lower back, a rigid LSO must be custom-fitted in order for it to be properly utilized by the patient.

207.    In a legitimate clinical setting, a rigid LSO is reserved for patients who exhibit spinal instability or for patients who have recently undergone spinal surgery.

208.    Because a rigid LSO is designed to limit the range of motion of a patient's lumbar spine, its prescription is inconsistent with the goals of treatment designed to restore and increase range of motion and functionality of the lumbar spine.

209.    Along similar lines, the prescription and use of a rigid LSO would be counterproductive to the goals of physical therapy treatment modalities, which seek to restore movement and functionality to the lumbar spine.

210.    In fact, the medically unnecessary prescription of a rigid LSO – and the resulting immobilization of the lumbar spine – may put a patient at a considerable risk of weakening of the muscles or even atrophy of the muscles in the lower back.

211.    Moreover, in a legitimate clinical setting, a rigid LSO should not be prescribed to a patient before the patient has first attempted and failed a legitimate course of conservative treatment, and it should not simultaneously be prescribed with conservative treatment such as physical therapy.

212.    The insureds in the claims identified in Exhibits "1" - "2" did not suffer from spinal instability. In fact, virtually none of the insureds in the claims identified in Exhibits "1" - "2" suffered any serious injuries at all as the result of their minor accidents, much less health problems requiring spinal surgery and subsequent immobilization of their spine.

213.    The insureds in the claims identified in Exhibits "1" - "2" generally had not attempted and failed a legitimate course of conservative treatment prior to their receipt of a prescription for a rigid LSO.

214.    Even so, the HME Defendants routinely purported to provide medically unnecessary HME to the insureds in the claims identified in Exhibits "1" - "2", despite the fact that:

(i)     the insureds did not suffer from spinal instability and were not recovering from spinal surgery;

(ii)    the HME Defendants did not measure or fit the devices for their insureds;

(iii)   the insureds had not yet failed any legitimate course of conservative treatment, and, in fact, were often prescribed the HME within days of their minor automobile accidents; and

(iv)    the insureds were often concomitantly prescribed a course of physical therapy at CIMA or CIMA Miami Springs, the supposed purpose of which was to restore the range of motion and functionality of – among other things – the insureds' lumbar spines, and the use of a rigid LSO would be counterproductive to this goal.

215.    For example:

(i)     On January 9, 2020, an insured named MF was involved in an automobile accident. On March 3, 2020, MF presented to CIMA for an initial examination. MF was immediately prescribed a course of physical therapy, which MF underwent at CIMA between March 3, 2020 and June 8, 2020. Nevertheless, MF was also prescribed medically unnecessary HME, despite the fact that MF: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at CIMA, the putative purpose of which was to increase, rather than decrease, MF's range of motion. The CIMA Defendants billed GEICO under HCPCS code L0631, seeking reimbursement of $2,064.31 for the medically unnecessary HME.

(ii)    On September 19, 2020, an insured named AT was involved in an automobile accident. On January 8, 2021, AT presented to CIMA for an initial examination. AT was immediately prescribed a course of physical therapy, which AT underwent at CIMA between January 8, 2021 and February 24, 2021. Nevertheless, AT was also prescribed medically unnecessary HME, despite the fact that AT: (a) did not

suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at CIMA, the putative purpose of which was to increase, rather than decrease, AT's range of motion. The CIMA Defendants billed GEICO under HCPCS code L0631, seeking reimbursement of $2,100.00 for the medically unnecessary HME.

(iii)    On December 9, 2020, an insured named MC was involved in an automobile accident. On December 15, 2020, MC presented to CIMA for an initial examination. MC was immediately prescribed a course of physical therapy, which MC underwent at CIMA between December 15, 2020 and May 13, 2021. Nevertheless, MC was also prescribed medically unnecessary HME, despite the fact that MC: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at CIMA, the putative purpose of which was to increase, rather than decrease, MC's range of motion. The CIMA Defendants billed GEICO under HCPCS code L0180, seeking reimbursement of $1,700.00 for the medically unnecessary HME.

(iv)    On January 24, 2021, an insured named JS was involved in an automobile accident. On January 28, 2021, JS presented to CIMA for an initial examination. JS was immediately prescribed a course of physical therapy, which JS underwent at CIMA between January 28, 2021 and March 24, 2021. Nevertheless, JS was also prescribed medically unnecessary HME, despite the fact that JS: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at CIMA, the putative purpose of which was to increase, rather than decrease, JS's range of motion. The CIMA Defendants billed GEICO under HCPCS code L0180, seeking reimbursement of $1,700.00 for the medically unnecessary HME.

(v)    On June 9, 2021, an insured named DF was involved in an automobile accident. On June 9, 2021, DF presented to CIMA for an initial examination. DF was immediately prescribed a course of physical therapy, which DF underwent at CIMA between June 9, 2021 and August 11, 2021. Nevertheless, DF was also prescribed medically unnecessary HME, despite the fact that DF: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at CIMA, the putative purpose of which was to increase, rather than decrease, DF's range of motion. The CIMA Defendants billed GEICO under HCPCS code L0180, seeking reimbursement of $1,700.00 for the medically unnecessary HME.

(vi)     On May 15, 2022, an insured named JP was involved in an automobile accident. On May 20, 2022, JP presented to CIMA Miami Springs for an initial examination. JP was immediately prescribed a course of physical therapy, which JP underwent at CIMA Miami Springs between June 1, 2022 and July 5, 2022. Nevertheless, JP was also prescribed medically unnecessary HME, despite the fact that JP: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at CIMA Miami Springs, the putative purpose of which was to increase, rather than decrease, JP's range of motion. The CIMA Miami Springs Defendants billed GEICO under HCPCS code L0631, seeking reimbursement of $2,100.00 for the medically unnecessary HME.

(vii)    On July 29, 2022, an insured named FP was involved in an automobile accident. On August 9, 2022, FP presented to CIMA Miami Springs for an initial examination. FP was immediately prescribed a course of physical therapy, which FP underwent at CIMA Miami Springs between August 9, 2022 and November 2, 2022. Nevertheless, FP was also prescribed medically unnecessary HME, despite the fact that FP: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at CIMA Miami Springs, the putative purpose of which was to increase, rather than decrease, FP's range of motion. The CIMA Miami Springs Defendants billed GEICO under HCPCS code L0631, seeking reimbursement of $2,100.00 for the medically unnecessary HME.

(viii)   On February 22, 2023, an insured named EG was involved in an automobile accident. On March 21, 2023, EG presented to CIMA Miami Springs for an initial examination. EG was immediately prescribed a course of physical therapy, which EG underwent at CIMA Miami Springs between March 21, 2023 and April 28, 2023. Nevertheless, EG was also prescribed medically unnecessary HME, despite the fact that EG: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at CIMA Miami Springs, the putative purpose of which was to increase, rather than decrease, EG's range of motion. The CIMA Miami Springs Defendants billed GEICO under HCPCS code L0631, seeking reimbursement of $2,100.00 for the medically unnecessary HME.

(ix)     On August 5, 2023, an insured named NG was involved in an automobile accident. On August 10, 2023, NG presented to CIMA Miami Springs for an initial examination. NG was immediately prescribed a course of physical therapy, which NG underwent at CIMA Miami Springs between August 10, 2023 and November

1, 2023. Nevertheless, NG was also prescribed medically unnecessary HME, despite the fact that NG: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at CIMA Miami Springs, the putative purpose of which was to increase, rather than decrease, NG's range of motion. The CIMA Miami Springs Defendants billed GEICO under HCPCS code L0631, seeking reimbursement of $2,100.00 for the medically unnecessary HME.

(x)     On October 31, 2023, an insured named ML was involved in an automobile accident. On November 13, 2023, ML presented to CIMA Miami Springs for an initial examination. ML was immediately prescribed a course of physical therapy, which ML underwent at CIMA Miami Springs between November 13 2023 and February 9, 2024. Nevertheless, ML was also prescribed medically unnecessary HME, despite the fact that ML: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at CIMA Miami Springs, the putative purpose of which was to increase, rather than decrease, ML's range of motion. The CIMA Miami Springs Defendants billed GEICO under HCPCS code L0180, seeking reimbursement of $1,700.00 for the medically unnecessary HME.

216.    These are only representative examples. In virtually all of the claims for HME identified in Exhibits "1" - "2", the HME Defendants falsely represented that the prescribed HME was medically necessary, when, in fact, it was not.

**F.      The Defendants' Violation of the False and Fraudulent Insurance Claims Statute**

217.    The Defendants knew that, if they made a legitimate, good-faith effort to collect deductibles from their patients, it would impede their ability to carry out the fraudulent and unlawful scheme described herein. For instance, if the Defendants made legitimate efforts to collect deductibles, insureds would be less likely to continue presenting to the Clinic Defendants for medically unnecessary treatment.

218.    Accordingly, as part and parcel of their fraudulent and unlawful scheme, the Defendants unlawfully engaged in the general business practice of waiving – or failing to make a

good-faith effort to collect – PIP deductibles from their patients, in violation of the False and Fraudulent Insurance Claims Statute.

219.    In keeping with this fact, in virtually all of the thousands of bills (i.e., the HCFA-1500 forms) submitted to GEICO through the Clinic Defendants' Fraudulent Services, the Defendants represented that they did not collect any money, whether it be a co-payment or a deductible, from the insureds.

220.    In the claims identified in Exhibits "1" - "4", the Defendants routinely and falsely represented that the underlying health care services were lawfully provided and reimbursable, when, in fact, they were neither lawfully provided nor reimbursable, because the Defendants operated in violation of the False and Fraudulent Insurance Claims Statute.

### III.    The Fraudulent and Unlawful Claims the Defendants Submitted to GEICO

221.    To support their fraudulent charges, the Defendants systematically submitted thousands of bills and treatment reports – containing thousands of individual charges – to GEICO through the respective Clinic Defendants, seeking payment for Fraudulent Services that the Defendants were not entitled to receive.

222.    The claims that the Defendants submitted – or caused to be submitted – to GEICO were false and misleading in the following material respects:

(i)    The bills and treatment reports submitted by the Defendants uniformly misrepresented to GEICO that the Defendants were in compliance with Florida law and were, therefore, eligible to collect PIP Benefits in the first instance, when, in fact, they were not.

(ii)    The bills and treatment reports submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were lawfully provided, lawfully billed to GEICO, and eligible for PIP reimbursement, when, in fact, they were not.

(iii)    The bills and treatment reports submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary

and, in many cases, misrepresented to GEICO that the Fraudulent Services were actually performed. In fact, the Fraudulent Services frequently were not performed at all, and – to the extent that they were performed – they were not medically necessary and were performed as part of pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, and not to benefit the insureds who supposedly were subjected to the Fraudulent Services.

(iv)    The bills and treatment reports submitted by and on behalf of the Defendants frequently misrepresented and exaggerated the level and nature of the Fraudulent Services that purportedly were provided.

## IV.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

223.    The Defendants were legally and ethically obligated to act honestly and with integrity in connection with their performance of the Fraudulent Services and their submission of charges to GEICO.

224.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systematically concealed their fraud and have gone to great lengths to accomplish this concealment.

225.    For instance, the Defendants knowingly misrepresented and concealed facts in an effort to prevent GEICO from discovering that the Defendants operated in violation of Florida law and were, therefore, ineligible to collect PIP Benefits in the first instance.

226.    The Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary, and frequently never even performed in the first instance.

227.    The Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were oftentimes unlawfully performed by massage therapists and unlicensed/unsupervised individuals, and unlawfully billed to GEICO.

228.    GEICO is under statutory and contractual duty to promptly and fairly process claims within thirty (30) days. The facially-valid documents submitted to GEICO in support of the

fraudulent charges at issue, combined with the material misrepresentations and acts of concealment described above, were designed to cause – and did cause – GEICO to rely on them. As a result, GEICO has incurred damages of more than $2,900,000.00.

229. GEICO did not discover – and could not reasonably have discovered – that its damages were attributable to fraud until shortly before it commenced this action.

**FIRST CAUSE OF ACTION**
**Against CIMA**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

230. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-229, above.

231. There is an actual case in controversy between GEICO and CIMA regarding more than $75,000.00 in fraudulent and unlawful pending billing that has been submitted to GEICO in the name of CIMA.

232. CIMA has no right to receive payment for any pending bills submitted to GEICO because CIMA unlawfully operated in violation of Florida law.

233. CIMA has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were neither lawfully provided nor lawfully billed to GEICO.

234. CIMA has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment to the insureds who purportedly received and were subjected to the Fraudulent Services.

235. CIMA has no right to receive payment for any pending bills submitted to GEICO

because – in many cases – the Fraudulent Services were never provided in the first instance.

236.    CIMA has no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided, in order to inflate the charges submitted to GEICO.

237.    Accordingly, GEICO requests that this Court enter a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that CIMA has no right to receive payment for any of the pending bills submitted to GEICO.

## SECOND CAUSE OF ACTION
### Against Infante and Cisneros
### (Violation of RICO – 18 U.S.C. § 1962(c))

238.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-229, above.

239.    CIMA is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

240.    Infante and Cisneros have knowingly conducted and/or participated in, directly or indirectly, the conduct of CIMA's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent charges on a continuous basis for over five years, seeking payments that CIMA was not eligible to receive, because: (i) CIMA unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants rather than

to provide medically necessary treatment to the insureds who purportedly received and were subjected to the Fraudulent Services; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

241.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

242.    CIMA's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurance companies. The predicate acts of mail fraud are the regular way in which Infante and Cisneros operated CIMA, inasmuch as CIMA was not engaged in a legitimate health care practice, and acts of mail fraud were, therefore, essential in order for CIMA to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that CIMA continues to attempt collection on the fraudulent billing submitted through CIMA to the present day.

243.    CIMA is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by CIMA in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

244.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,228,000.00 pursuant to the fraudulent bills submitted through CIMA.

245.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

**THIRD CAUSE OF ACTION**
**Against Infante, Cisneros, and Abraham**
**(Violation of RICO – 18 U.S.C. § 1962(d))**

246.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-229, above.

247.     CIMA is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

248.     Infante, Cisneros, and Abraham are employed by, or associated with, the CIMA enterprise.

249.     Infante, Cisneros, and Abraham knowingly have agreed, combined, and conspired to conduct and/or participate in, directly or indirectly, the conduct of CIMA's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent charges on a continuous basis for over five years, seeking payments that CIMA was not eligible to receive under the No-Fault Law, because: (i) CIMA unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to provide medically necessary treatment to the insureds who purportedly received and were subjected to the Fraudulent Services; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes

used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

250.     A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

251.     Infante, Cisneros, and Abraham knew of, agreed to, and acted in furtherance of the common and overall objective – i.e., to defraud GEICO and other automobile insurers of money – by submitting or facilitating the submission of the fraudulent charges to GEICO.

252.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,228,000.00 pursuant to the fraudulent bills submitted through the CIMA enterprise.

253.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

### FOURTH CAUSE OF ACTION
### Against CIMA, Infante, Cisneros, Abraham, and Casta
### (Under Fla. Stat. §§ 501.201 et seq.)

254.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-229, above.

255.     CIMA, Infante, Cisneros, Abraham, and Casta are actively engaged in trade and commerce in the State of Florida.

256.     GEICO and its insureds are "consumers" as defined by Fla. Stat. § 501.23.

257.     CIMA, Infante, Cisneros, Abraham, and Casta engaged in unfair, deceptive, and

unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

258.    The bills and supporting documents submitted to GEICO by CIMA, Infante, Cisneros, Abraham, and Casta in connection with the Fraudulent Services were fraudulent in that they misrepresented: (i) CIMA's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services were actually performed in the first instance.

259.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of CIMA, Infante, Cisneros, Abraham, and Casta has been materially injurious to GEICO and its insureds.

260.    The conduct of CIMA, Infante, Cisneros, Abraham, and Casta was the actual and proximate cause of the damages sustained by GEICO.

261.    CIMA, Infante, Cisneros, Abraham, and Casta's unfair and deceptive acts have caused GEICO to sustain damages of at least $2,228,000.00.

262.    By reason of CIMA, Infante, Cisneros, Abraham, and Casta's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

**FIFTH CAUSE OF ACTION**
**Against CIMA, Infante, Cisneros, Abraham, and Casta**
**(Common Law Fraud)**

263.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-229, above.

264.    CIMA, Infante, Cisneros, Abraham, and Casta intentionally and knowingly made false and fraudulent statements of material fact to GEICO, and concealed material facts from

GEICO, in the course of their submission of thousands of fraudulent bills through CIMA for the Fraudulent Services.

265.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that CIMA was in compliance with Florida law and was eligible to collect PIP Benefits in the first instance, when, in fact, it was not in compliance with Florida law and was not eligible to collect PIP Benefits in the first instance; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and were eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, the Fraudulent Services were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were actually performed, when, in many cases, the Fraudulent Services were not actually performed.

266.    CIMA, Infante, Cisneros, Abraham, and Casta made the above-described false and fraudulent statements, and also concealed material facts, in a calculated effort to induce GEICO to pay charges submitted through CIMA that were not reimbursable.

267.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result, has been injured in its business and property by reason of the above-described conduct, in that it has paid at least $2,228,000.00 pursuant to the fraudulent bills that were submitted – or caused to be submitted – by CIMA, Infante, Cisneros, Abraham, and Casta through CIMA.

268.    CIMA, Infante, Cisneros, Abraham, and Casta's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

269.     Accordingly, GEICO is entitled to compensatory and punitive damages, together with interest and costs, along with such other and further relief as this Court deems just, proper, and equitable.

## SIXTH CAUSE OF ACTION
### Against CIMA, Infante, Cisneros, Abraham, and Casta
### (Unjust Enrichment)

270.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-229, above.

271.     As set forth above, CIMA, Infante, Cisneros, Abraham, and Casta have engaged in improper, unlawful, and unjust acts, all to the harm and detriment of GEICO.

272.     When GEICO paid the bills and charges submitted – or caused to be submitted – by CIMA, Infante, Cisneros, Abraham, and Casta, it reasonably believed that it was legally obligated to make such payments based on CIMA, Infante, Cisneros, Abraham, and Casta's improper, unlawful, and unjust acts.

273.     CIMA, Infante, Cisneros, Abraham, and Casta have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that CIMA, Infante, Cisneros, Abraham, and Casta voluntarily accepted, notwithstanding their improper, unlawful, and unjust billing scheme.

274.     CIMA, Infante, Cisneros, Abraham, and Casta's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

275.     By reason of the above, CIMA, Infante, Cisneros, Abraham, and Casta have been unjustly enriched in an amount to be determined at trial, but in no event less than $2,228,000.00.

### SEVENTH CAUSE OF ACTION
**Against CIMA Miami Springs**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

276.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-229, above.

277.   There is an actual case in controversy between GEICO and CIMA Miami Springs regarding more than $75,000.00 in fraudulent and unlawful pending billing that has been submitted to GEICO in the name of CIMA Miami Springs.

278.   CIMA Miami Springs has no right to receive payment for any pending bills submitted to GEICO because CIMA Miami Springs unlawfully operated in violation of Florida law.

279.   CIMA Miami Springs has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were neither lawfully provided nor lawfully billed to GEICO.

280.   CIMA Miami Springs has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment to the insureds who purportedly received and were subjected to the Fraudulent Services.

281.   CIMA Miami Springs has no right to receive payment for any pending bills submitted to GEICO because – in many cases – the Fraudulent Services were never provided in the first instance.

282.   CIMA Miami Springs has no right to receive payment for any pending bills

submitted to GEICO because the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided, in order to inflate the charges submitted to GEICO.

283.    Accordingly, GEICO requests that this Court enter a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that CIMA Miami Springs has no right to receive payment for any of the pending bills submitted to GEICO.

**EIGHTH CAUSE OF ACTION**
**Against Infante and Cisneros**
**(Violation of RICO – 18 U.S.C. § 1962(c))**

284.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-229, above.

285.    CIMA Miami Springs is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

286.    Infante and Cisneros knowingly conducted and/or participated in, directly or indirectly, the conduct of CIMA Miami Springs' affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent charges on a continuous basis for over five years, seeking payments that CIMA Miami Springs was not eligible to receive, because: (i) CIMA Miami Springs unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to provide medically necessary treatment to the insureds who purportedly received and were subjected to the Fraudulent Services; (iv) in many cases, the

Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

287.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

288.    CIMA Miami Springs' business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurance companies. The predicate acts of mail fraud are the regular way in which Infante and Cisneros operated CIMA Miami Springs, inasmuch as CIMA Miami Springs was not engaged in a legitimate health care practice, and acts of mail fraud were, therefore, essential in order for CIMA Miami Springs to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that CIMA Miami Springs continues to attempt collection on the fraudulent billing submitted through CIMA Miami Springs to the present day.

289.    CIMA Miami Springs is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by CIMA Miami Springs in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

290.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $227,400.00 pursuant to the fraudulent bills submitted through CIMA Miami Springs.

291.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

**NINTH CAUSE OF ACTION**
**Against Infante, Cisneros, and Casta**
**(Violation of RICO – 18 U.S.C. § 1962(d))**

292.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-229, above.

293.    CIMA Miami Springs is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

294.    Infante, Cisneros, and Casta are employed by, or associated with, the CIMA Miami Springs enterprise.

295.    Infante, Cisneros, and Casta have knowingly agreed, combined, and conspired to collect and/or participate in, directly or indirectly, the conduct of CIMA Miami Springs' affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent charges on a continuous basis for over five years, seeking payments that CIMA Miami Springs was not eligible to receive under the No-Fault Law, because: (i) CIMA Miami Springs unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to provide medically necessary treatment to the insureds who purportedly received and were subjected to the Fraudulent Services; (iv) in many cases, the Fraudulent Services were never

provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

296.    A representative sample of the fraudulent billing and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

297.    Infante, Cisneros, and Casta knew of, agreed to, and acted in furtherance of the common and overall objective – i.e., to defraud GEICO and other automobile insurers of money – by submitting or facilitating the submission of the fraudulent charges to GEICO.

298.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $227,400.00 pursuant to the fraudulent bills submitted through the CIMA Miami Springs enterprise.

299.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

**TENTH CAUSE OF ACTION**
**Against CIMA Miami Springs, Infante, Cisneros, and Casta**
**(Under Fla. Stat. §§ 501.201 et seq.)**

300.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-229, above.

301.    CIMA Miami Springs, Infante, Cisneros, and Casta are actively engaged in trade and commerce in the State of Florida.

302.    GEICO and its insureds are "consumers" as defined by Fla. Stat. § 501.23.

303.     CIMA Miami Springs, Infante, Cisneros, and Casta engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

304.     The bills and supporting documents submitted to GEICO by CIMA Miami Springs, Infante, Cisneros, and Casta in connection with the Fraudulent Services were fraudulent in that they misrepresented: (i) CIMA Miami Springs' eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services were actually performed in the first instance.

305.     Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of CIMA Miami Springs, Infante, Cisneros, and Casta has been materially injurious to GEICO and its insureds.

306.     The conduct of CIMA Miami Springs, Infante, Cisneros, and Casta was the actual and proximate cause of the damages sustained by GEICO.

307.     CIMA Miami Springs, Infante, Cisneros, and Casta's unfair and deceptive acts have caused GEICO to sustain damages of at least $227,400.00.

308.     By reason of CIMA Miami Springs, Infante, Cisneros, and Casta's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

## ELEVENTH CAUSE OF ACTION
### Against CIMA Miami Springs, Infante, Cisneros, and Casta
### (Common Law Fraud)

309.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-229, above.

310.     CIMA Miami Springs, Infante, Cisneros, and Casta intentionally and knowingly

made false and fraudulent statements of material fact to GEICO, and concealed material facts from GEICO, in the course of their submission of thousands of fraudulent bills through CIMA Miami Springs for the Fraudulent Services.

311.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that CIMA Miami Springs was in compliance with Florida law and was eligible to collect PIP Benefits in the first instance, when, in fact, it was not in compliance with Florida law and was not eligible to collect PIP Benefits in the first instance; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and were eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, the Fraudulent Services were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were actually performed, when, in many cases, the Fraudulent Services were not actually performed.

312.    CIMA Miami Springs, Infante, Cisneros, and Casta made the above-described false and fraudulent statements, and also concealed material facts, in a calculated effort to induce GEICO to pay charges submitted through CIMA Miami Springs that were not reimbursable.

313.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result, has been injured in its business and property by reason of the above-described conduct, in that it has paid at least $227,400.00 pursuant to the fraudulent bills that were submitted – or caused to be submitted – by CIMA Miami Springs, Infante, Cisneros, and Casta.

314.    CIMA Miami Springs, Infante, Cisneros, and Casta's extensive fraudulent conduct

demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

315.    Accordingly, GEICO is entitled to compensatory and punitive damages, together with interest and costs, along with such other and further relief as this Court deems just, proper, and equitable.

**TWELFTH CAUSE OF ACTION**
**Against CIMA Miami Springs, Infante, Cisneros, and Casta**
**(Unjust Enrichment)**

316.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-229, above.

317.    As set forth above, CIMA Miami Springs, Infante, Cisneros, and Casta have engaged in improper, unlawful, and unjust acts, all to the harm and detriment of GEICO.

318.    When GEICO paid the bills and charges submitted – or caused to be submitted – by CIMA Miami Springs, Infante, Cisneros, and Casta through CIMA Miami Springs, it reasonably believed that it was legally obligated to make such payments based on CIMA Miami Springs, Infante, Cisneros, and Casta's improper, unlawful, and unjust acts.

319.    CIMA Miami Springs, Infante, Cisneros, and Casta have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that CIMA Miami Springs, Infante, Cisneros, and Casta voluntarily accepted, notwithstanding their improper, unlawful, and unjust billing scheme.

320.    CIMA Miami Springs, Infante, Cisneros, and Casta's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

321.    By reason of the above, CIMA Miami Springs, Infante, Cisneros, and Casta have been unjustly enriched in an amount to be determined at trial, but in no event less than $227,400.00.

## THIRTEENTH CAUSE OF ACTION
### Against Castellon
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

322.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-229, above.

323.    There is an actual case in controversy between GEICO and Castellon regarding more than $75,000.00 in fraudulent and unlawful pending billing that has been submitted to GEICO in the name of Castellon.

324.    Castellon has no right to receive payment for any pending bills submitted to GEICO because Castellon unlawfully operated in violation of Florida law.

325.    Castellon has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were neither lawfully provided nor lawfully billed to GEICO.

326.    Castellon has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment to the insureds who purportedly received and were subjected to the Fraudulent Services.

327.    Castellon has no right to receive payment for any pending bills submitted to GEICO because – in many cases – the Fraudulent Services were never provided in the first instance.

328.    Castellon has no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided, in order to inflate the charges submitted to GEICO.

329.     Accordingly, GEICO requests that this Court enter a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Castellon has no right to receive payment for any of the pending bills submitted to GEICO.

**FOURTEENTH CAUSE OF ACTION**
**Against Perez**
**(Violation of RICO – 18 U.S.C. § 1962(c))**

330.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-229, above.

331.     Castellon is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

332.     Perez knowingly conducted and/or participated in, directly or indirectly, the conduct of Castellon's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent charges on a continuous basis for over five years, seeking payments that Castellon was not eligible to receive, because: (i) Castellon unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to provide medically necessary treatment to the insureds who purportedly received and were subjected to the Fraudulent Services; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

333.     A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".

334.     Castellon's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurance companies. The predicate acts of mail fraud are the regular way in which Perez operated Castellon, inasmuch as Castellon was not engaged in a legitimate health care practice, and acts of mail fraud were, therefore, essential in order for Castellon to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Castellon continues to attempt collection on the fraudulent billing submitted through Castellon to the present day.

335.     Castellon is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Castellon in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

336.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $379,100.00 pursuant to the fraudulent bills submitted through Castellon.

337.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

### FIFTEENTH CAUSE OF ACTION
**Against Perez and Casta**
**(Violation of RICO – 18 U.S.C. § 1962(d))**

338.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-229, above.

339.    Castellon is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

340.    Perez and Casta are employed by, or associated with, the Castellon enterprise.

341.    Perez and Casta have knowingly agreed, combined, and conspired to collect and/or participate in, directly or indirectly, the conduct of Castellon's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent charges on a continuous basis for over five years, seeking payments that Castellon was not eligible to receive under the No-Fault Law, because: (i) Castellon unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to provide medically necessary treatment to the insureds who purportedly received and were subjected to the Fraudulent Services; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

342.    A representative sample of the fraudulent billing and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through

the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3". Each such mailing was made in furtherance of the mail fraud scheme.

343.    Perez and Casta knew of, agreed to, and acted in furtherance of the common and overall objective – i.e., to defraud GEICO and other automobile insurers of money – by submitting or facilitating the submission of the fraudulent charges to GEICO.

344.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $379,100.00 pursuant to the fraudulent bills submitted through the Castellon enterprise.

345.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

**SIXTEENTH CAUSE OF ACTION**
**Against Castellon, Perez, and Casta**
**(Under Fla. Stat. §§ 501.201 et seq.)**

346.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-229, above.

347.    Castellon, Perez, and Casta are actively engaged in trade and commerce in the State of Florida.

348.    GEICO and its insureds are "consumers" as defined by Fla. Stat. § 501.23.

349.    Castellon, Perez, and Casta engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

350.    The bills and supporting documents submitted to GEICO by Castellon, Perez, and Casta in connection with the Fraudulent Services were fraudulent in that they misrepresented: (i)

Castellon's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services were actually performed in the first instance.

351.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of Castellon, Perez, and Casta has been materially injurious to GEICO and its insureds.

352.    The conduct of Castellon, Perez, and Casta was the actual and proximate cause of the damages sustained by GEICO.

353.    Castellon, Perez, and Casta's unfair and deceptive acts have caused GEICO to sustain damages of at least $379,100.00.

354.    By reason of Castellon, Perez, and Casta's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

**SEVENTEENTH CAUSE OF ACTION**
**Against Castellon, Perez, and Casta**
**(Common Law Fraud)**

355.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-229, above.

356.    Castellon, Perez, and Casta intentionally and knowingly made false and fraudulent statements of material fact to GEICO, and concealed material facts from GEICO, in the course of their submission of thousands of fraudulent bills through Castellon for the Fraudulent Services.

357.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Castellon was in compliance with Florida law and was eligible to collect PIP Benefits in the first instance, when, in fact, it was not in compliance with Florida law and was not eligible to collect PIP Benefits in the first instance;

(ii) in every claim, the representation that the Fraudulent Services were lawfully provided and were eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, the Fraudulent Services were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were actually performed, when, in many cases, the Fraudulent Services were not actually performed.

358.    Castellon, Perez, and Casta made the above-described false and fraudulent statements, and also concealed material facts, in a calculated effort to induce GEICO to pay charges submitted through Castellon that were not reimbursable.

359.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result, has been injured in its business and property by reason of the above-described conduct, in that it has paid at least $379,100.00 pursuant to the fraudulent bills that were submitted – or caused to be submitted – by Castellon, Perez, and Casta.

360.    Castellon, Perez, and Casta's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

361.    Accordingly, GEICO is entitled to compensatory and punitive damages, together with interest and costs, along with such other and further relief as this Court deems just, proper, and equitable.

### EIGHTEENTH CAUSE OF ACTION
**Against Castellon, Perez, and Casta**
**(Unjust Enrichment)**

362.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-229, above.

363.    As set forth above, Castellon, Perez, and Casta have engaged in improper, unlawful,

and unjust acts, all to the harm and detriment of GEICO.

364.    When GEICO paid the bills and charges submitted – or caused to be submitted –
by Castellon, Perez, and Casta through Castellon, it reasonably believed that it was legally
obligated to make such payments based on Castellon, Perez, and Casta's improper, unlawful, and
unjust acts.

365.    Castellon, Perez, and Casta have been enriched at GEICO's expense by GEICO's
payments, which constituted a benefit that Castellon, Perez, and Casta voluntarily accepted,
notwithstanding their improper, unlawful, and unjust billing scheme.

366.    Castellon, Perez, and Casta's retention of GEICO's payments violates fundamental
principles of justice, equity, and good conscience.

367.    By reason of the above, Castellon, Perez, and Casta have been unjustly enriched in
an amount to be determined at trial, but in no event less than $379,100.00.

**NINETEENTH CAUSE OF ACTION**
**Against Community Choice**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

368.    GEICO incorporates, as though fully set forth herein, each and every allegation in
paragraphs 1-229, above.

369.    There is an actual case in controversy between GEICO and Community Choice
regarding more than $75,000.00 in fraudulent and unlawful pending billing that has been submitted
to GEICO in the name of Community Choice.

370.    Community Choice has no right to receive payment for any pending bills submitted
to GEICO because Community Choice unlawfully operated in violation of Florida law.

371.    Community Choice has no right to receive payment for any pending bills submitted
to GEICO because the underlying Fraudulent Services were neither lawfully provided nor lawfully

billed to GEICO.

372.     Community Choice has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment to the insureds who purportedly received and were subjected to the Fraudulent Services.

373.     Community Choice has no right to receive payment for any pending bills submitted to GEICO because – in many cases – the Fraudulent Services were never provided in the first instance.

374.     Community Choice has no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided, in order to inflate the charges submitted to GEICO.

375.     Accordingly, GEICO requests that this Court enter a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Community Choice has no right to receive payment for any of the pending bills submitted to GEICO.

**TWENTIETH CAUSE OF ACTION**
**Against Garcia Prada**
**(Violation of RICO – 18 U.S.C. § 1962(c))**

376.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-229, above.

377.     Community Choice is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

378.     Garcia Prada knowingly conducted and/or participated in, directly or indirectly, the

conduct of Community Choice's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent charges on a continuous basis for over four years, seeking payments that Community Choice was not eligible to receive, because: (i) Community Choice unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to provide medically necessary treatment to the insureds who purportedly received and were subjected to the Fraudulent Services; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

379. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4".

380. Community Choice's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurance companies. The predicate acts of mail fraud are the regular way in which Garcia Prada operated Community Choice, inasmuch as Community Choice was not engaged in a legitimate health care practice, and acts of mail fraud were, therefore, essential in order for Community Choice to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Community Choice continues to attempt

collection on the fraudulent billing submitted through Community Choice to the present day.

381.    Community Choice is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Community Choice in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

382.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $103,400.00 pursuant to the fraudulent bills submitted through Community Choice.

383.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

**TWENTY-FIRST CAUSE OF ACTION**
**Against Garcia Prada and Casta**
**(Violation of RICO – 18 U.S.C. § 1962(d))**

384.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-229, above.

385.    Community Choice is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

386.    Garcia Prada and Casta are employed by, or associated with, the Community Choice enterprise.

387.    Garcia Prada and Casta have knowingly agreed, combined, and conspired to collect and/or participate in, directly or indirectly, the conduct of Community Choice's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute,

18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent charges on a continuous basis for over four years, seeking payments that Community Choice was not eligible to receive under the No-Fault Law, because: (i) Community Choice unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to provide medically necessary treatment to the insureds who purportedly received and were subjected to the Fraudulent Services; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

388. A representative sample of the fraudulent billing and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4". Each such mailing was made in furtherance of the mail fraud scheme.

389. Garcia Prada and Casta knew of, agreed to, and acted in furtherance of the common and overall objective – i.e., to defraud GEICO and other automobile insurers of money – by submitting or facilitating the submission of the fraudulent charges to GEICO.

390. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $103,400.00 pursuant to the fraudulent bills submitted through the Community Choice enterprise.

391. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable

attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

## TWENTY-SECOND CAUSE OF ACTION
### Against Community Choice, Garcia Prada, and Casta
### (Under Fla. Stat. §§ 501.201 et seq.)

392.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-229, above.

393.    Community Choice, Garcia Prada, and Casta are actively engaged in trade and commerce in the State of Florida.

394.    GEICO and its insureds are "consumers" as defined by Fla. Stat. § 501.23.

395.    Community Choice, Garcia Prada, and Casta engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

396.    The bills and supporting documents submitted to GEICO by Community Choice, Garcia Prada, and Casta in connection with the Fraudulent Services were fraudulent in that they misrepresented: (i) Community Choice's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services were actually performed in the first instance.

397.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of Community Choice, Garcia Prada, and Casta has been materially injurious to GEICO and its insureds.

398.    The conduct of Community Choice, Garcia Prada, and Casta was the actual and proximate cause of the damages sustained by GEICO.

399.    Community Choice, Garcia Prada, and Casta's unfair and deceptive acts have caused GEICO to sustain damages of at least $103,400.00.

400.    By reason of Community Choice, Garcia Prada, and Casta's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

**TWENTY-THIRD CAUSE OF ACTION**
**Against Community Choice, Garcia Prada, and Casta**
**(Common Law Fraud)**

401.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-229, above.

402.    Community Choice, Garcia Prada, and Casta intentionally and knowingly made false and fraudulent statements of material fact to GEICO, and concealed material facts from GEICO, in the course of their submission of thousands of fraudulent bills through Community Choice for the Fraudulent Services.

403.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Community Choice was in compliance with Florida law and was eligible to collect PIP Benefits in the first instance, when, in fact, it was not in compliance with Florida law and was not eligible to collect PIP Benefits in the first instance; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and were eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, the Fraudulent Services were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were actually performed, when, in many cases, the Fraudulent Services were not actually performed.

404.    Community Choice, Garcia Prada, and Casta made the above-described false and fraudulent statements, and also concealed material facts, in a calculated effort to induce GEICO to pay charges submitted through Community Choice that were not reimbursable.

405.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result, has been injured in its business and property by reason of the above-described conduct, in that it has paid at least $103,400.00 pursuant to the fraudulent bills that were submitted – or caused to be submitted – by Community Choice, Garcia Prada, and Casta.

406.    Community Choice, Garcia Prada, and Casta's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

407.    Accordingly, GEICO is entitled to compensatory and punitive damages, together with interest and costs, along with such other and further relief as this Court deems just, proper, and equitable.

## TWENTY-FOURTH CAUSE OF ACTION
### Against Community Choice, Garcia Prada, and Casta
### (Unjust Enrichment)

408.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-229, above.

409.    As set forth above, Community Choice, Garcia Prada, and Casta have engaged in improper, unlawful, and unjust acts, all to the harm and detriment of GEICO.

410.    When GEICO paid the bills and charges submitted – or caused to be submitted – by Community Choice, Garcia Prada, and Casta through Community Choice, it reasonably believed that it was legally obligated to make such payments based on Community Choice, Garcia

Prada, and Casta's improper, unlawful, and unjust acts.

411.   Community Choice, Garcia Prada, and Casta have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Community Choice, Garcia Prada, and Casta voluntarily accepted, notwithstanding their improper, unlawful, and unjust billing scheme.

412.   Community Choice, Garcia Prada, and Casta's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

413.   By reason of the above, Community Choice, Garcia Prada, and Casta have been unjustly enriched in an amount to be determined at trial, but in no event less than $103,400.00.

## JURY DEMAND

414.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE,** Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.   On the First Cause of Action against CIMA, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that CIMA has no right to receive payment for any pending bills submitted to GEICO.

B.   On the Second Cause of Action against Infante and Cisneros, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $2,228,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

C.   On the Third Cause of Action against Infante, Cisneros, and Abraham,

compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $2,228,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

D.      On the Fourth Cause of Action against CIMA, Infante, Cisneros, and Abraham, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $2,228,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

E.      On the Fifth Cause of Action against CIMA, Infante, Cisneros, and Abraham, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $2,228,000.00, together with punitive damages, costs, and interest, along with such other and further relief as this Court deems just, proper, and equitable.

F.      On the Sixth Cause of Action against CIMA, Infante, Cisneros, and Abraham, more than $2,228,000.00 in compensatory damages in favor of GEICO, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

G.      On the Seventh Cause of Action against CIMA Miami Springs, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that CIMA Miami Springs has no right to receive payment for any pending bills submitted to GEICO.

H.      On the Eighth Cause of Action against Infante and Cisneros, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $227,400.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

I.      On the Ninth Cause of Action against Infante, Cisneros, and Casta, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $227,400.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

J.      On the Tenth Cause of Action against CIMA Miami Springs, Infante, Cisneros, and Casta, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $227,400.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

K.      On the Eleventh Cause of Action against CIMA Miami Springs, Infante, Cisneros, and Casta, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $227,400.00, together with punitive damages, costs, and interest, along with such other and further relief as this Court deems just, proper, and equitable.

L.      On the Twelfth Cause of Action against CIMA Miami Springs, Infante, Cisneros, and Casta, more than $227,400.00 in compensatory damages in favor of GEICO, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

M.      On the Thirteenth Cause of Action against Castellon, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Castellon has no right to receive payment for any pending bills submitted to GEICO.

N.      On the Fourteenth Cause of Action against Perez, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $379,100.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

O.      On the Fifteenth Cause of Action against Perez and Casta, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $379,100.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

P.      On the Sixteenth Cause of Action against Castellon, Perez, and Casta, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $379,100.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

Q.      On the Seventeenth Cause of Action against Castellon, Perez, and Casta, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $379,100.00, together with punitive damages, costs, and interest, along with such other and further relief as this Court deems just, proper, and equitable.

R.      On the Eighteenth Cause of Action against Castellon, Perez, and Casta, more than $379,100.00 in compensatory damages in favor of GEICO, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

S.      On the Nineteenth Cause of Action against Community Choice, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Community Choice has no right to receive payment for any pending bills submitted to GEICO.

T.      On the Twentieth Cause of Action against Garcia Prada, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $103,400.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

U.      On the Twenty-First Cause of Action against Garcia Prada and Casta, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of

$103,400.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

   V.  On the Twenty-Second Cause of Action against Community Choice, Garcia Prada, and Casta, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $103,400.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

   W.  On the Twenty-Third Cause of Action against Community Choice, Garcia Prada, and Casta, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $103,400.00, together with punitive damages, costs, and interest, along with such other and further relief as this Court deems just, proper, and equitable.

   X.  On the Twenty-Fourth Cause of Action against Community Choice, Garcia Prada, and Casta, more than $103,400.00 in compensatory damages in favor of GEICO, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

Dated: Jacksonville, Florida
   October 7, 2025

         /s/ Max Gershenoff
         Max Gershenoff (FBN 1038855)
         John P. Marino (FBN 814539)
         Lindsey R. Trowell (FBN 678783)
         Kristen Wenger (FBN 92136)
         RIVKIN RADLER, LLP
         1301 Riverplace Blvd., 10th Floor
         Jacksonville, FL 32207
         Phone: (904) 792-8925
         -and-
         926 RXR Plaza
         Uniondale, New York 11550
         Phone: (516) 357-3000
         Max.Gershenoff@rivkin.com
         John.Marino@rivkin.com

Lindsey.Trowell@rivkin.com
Kristen.Wenger@rivkin.com

*Counsel for Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO Insurance Company, and GEICO Casualty Co.*